STATE OF NORTH CAROLINA v. PAUL EUGENE LYONS

No. 379A94

(Filed 28 July 1995)

1. **Homicide § 244 (NCI4th)— shooting of police officer— first-degree murder—premeditation and deliberation— intent to kill—sufficiency of evidence**

The State's evidence was sufficient to show that defendant acted with a specific intent to kill after premeditation and deliberation so as to support his conviction of first-degree murder of a police officer where it tended to show that it was quiet as the victim and other officers approached defendant's apartment to execute a search warrant; all the officers were in full uniform; an officer announced the presence of the police by yelling "Police search" several times; after several strikes on the door with a battering ram, the victim was able to get the door of the apartment open, and another officer took two full strides inside the apartment before defendant shot at that officer but instead hit the victim; after shooting the victim, defendant ran to his back door, encountered another officer, and said he was tired of the police trying to "bust my house"; there were three misfired rounds in defendant's pistol; and the location of these rounds indicated that defendant had pulled the trigger three times before he was able to fire the shot which killed the victim.

**Am Jur 2d, Homicide §§ 45-52, 104, 263-269, 439.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

2. **Homicide §§ 476, 489 (NCI4th)— inference of intent to kill, premeditation and deliberation—instructions—no mandatory presumption**

The trial court's instructions that an intent to kill and premeditation and deliberation may be inferred from certain relevant circumstances did not establish an unconstitutional mandatory presumption because they failed to include the phrase, "you are not compelled to do so," since there was nothing in the instructions which suggested that the jury *must* infer an intent to kill or premeditation and deliberation.

**Am Jur 2d, Homicide §§ 52, 263-269, 439.**

**Homicide: presumption of deliberation or premeditation from the fact of killing. 86 ALR2d 656.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

3. **Homicide § 609 (NCI4th)— self-defense—absence of reasonable belief—instruction not required**

A defendant who shot a police officer executing a search warrant for defendant's apartment when officers used a battering ram to open the door to the apartment and an officer stepped inside was not entitled to an instruction on perfect or imperfect self-defense in his first-degree murder trial because the evidence did not show that he had formed a reasonable belief that it was necessary to kill the person inside his doorway in order to save himself from death or great bodily harm where the evidence tended to show that defendant shot at the officer inside the apartment but instead hit the victim; defendant's evidence tended to show that when he heard the blows on his door, he was scared and thought he was being robbed again; and defendant testified that he intended only to shoot a warning shot, that he didn't intend to shoot anyone, and that his intent was to shoot at the top of the door. Defendant's self-serving statement that he was "scared" is not evidence that defendant formed the belief that it was necessary to kill in order to save himself.

**Am Jur 2d, Homicide § 153.**

**Duty of trial court to instruct on self-defense, in absence of request by accused. 56 ALR2d 1170.**

**Homicide: modern status of rules as to burden and quantum of proof to show self-defense. 43 ALR3d 221.**

**Standard for determination of reasonableness of criminal defendant's belief, for purposes of self-defense claim, that physical force is necessary—modern cases. 73 ALR4th 993.**

**4. Homicide § 566 (NCI4th)— first-degree murder—voluntary manslaughter instruction not required—any error cured by verdict**

Defendant was not entitled to an instruction on voluntary manslaughter premised upon imperfect self-defense in this first-degree murder trial where defendant was not entitled to an instruction on imperfect self-defense because the evidence did not indicate that defendant formed a belief that it was necessary to kill the deceased in order to protect himself from death or great bodily harm. Assuming that defendant acted under adequate provocation when he fired his pistol, the trial court's refusal to instruct on voluntary manslaughter was harmless error where the trial court properly instructed on first-degree and second-degree murder, and the jury found defendant guilty of first-degree murder.

**Am Jur 2d, Homicide §§ 45-52, 70, 525-534.**

**Modern status of the rules requiring malice "aforethought," "deliberation," or "premeditation," as elements of murder in the first degree. 18 ALR4th 961.**

**5. Homicide § 709 (NCI4th)— failure to instruct on involuntary manslaughter—error cured by verdict**

Even if defendant was entitled to an instruction on involuntary manslaughter based on evidence that he recklessly discharged his .38-caliber revolver, any error in the trial court's failure to instruct on involuntary manslaughter is harmless where the jury was properly instructed on first-degree and second-degree murder and thereafter returned a verdict of guilty of first-degree murder based on premeditation and deliberation.

**Am Jur 2d, Homicide § 70.**

**Inconsistency of criminal verdict as between different counts of indictment or information. 18 ALR3d 259.**

**Modern status of law regarding cure of error, in instruction as to one offense, by conviction of higher or lesser offense. 15 ALR4th 118.**

6. **Homicide §§ 643, 647 (NCI4th)— imperfect defense of habitation—theory not recognized—instruction on defense of habitation not required**

The theory of imperfect defense of habitation will not be recognized in this State, and the trial court in a capital trial thus did not deny defendant due process when it failed to instruct on voluntary manslaughter based upon imperfect defense of habitation. In any event, defendant, who shot a police officer attempting to execute a search warrant for defendant's apartment, was not entitled to *any* instruction on defense of habitation where defendant contended that, while he could or should have heard the police announce their presence, he did not believe the announcement because of past robberies and unreasonably believed the policemen were would-be robbers, since defendant's belief in the need to prevent a forcible entry was thus not reasonable.

**Am Jur 2d, Homicide §§ 174-179, 291, 519.**

**Homicide: Extent of premises which may be defended without retreat under right of self-defense. 52 ALR2d 1458.**

7. **Appeal and Error § 504 (NCI4th)— instruction requested by defendant—invited error**

Where defendant made a formal, written request for an instruction on transferred intent in this capital trial, defendant cannot complain on appeal that the evidence did not support such an instruction. N.C.G.S. § 15A-1443(c).

**Am Jur 2d, Homicide §§ 482-497.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

8. **Jury §§ 70, 103 (NCI4th)— capital trial—denial of jury questionnaire and sequestered voir dire—no abuse of discretion**

The trial court in a capital trial did not abuse its discretion or violate defendant's due process rights by denying defendant's motions for the use of a jury questionnaire and for individual, sequestered jury *voir dire*, since it is entirely speculative that a

prospective juror would only be honest and candid through sequestered questioning and in response to a questionnaire, and defendant made no showing that he was prohibited from asking prospective jurors, individually, the same questions set out in his questionnaire.

**Am Jur 2d, Jury §§ 189-210.**

**Right of counsel in criminal case personally to conduct the voir dire examination of prospective jurors. 73 ALR2d 1187.**

**Right of defense in criminal prosecution to disclosure of prosecution information regarding prospective jurors. 86 ALR3d 571.**

**Effect of accused's federal constitutional rights on scope of voir dire examination of prospective jurors— Supreme Court cases. 114 L. Ed. 2d 763.**

9. **Evidence and Witnesses § 357 (NCI4th)— murder of officer—purchase of marijuana from defendant—admissibility to show motive—balancing test satisfied**

   In a prosecution of defendant for first-degree murder of a law officer who was executing a search warrant for defendant's apartment, testimony by a witness that he had purchased marijuana from defendant the day before the shooting was properly admitted for the limited purpose of showing that defendant had a motive for the shooting where the State's theory of the case was that defendant, as a known drug dealer, had a motive to kill a law officer; the State's evidence tended to show that officers yelled "Police, search warrant" several times; the officers were in uniform, the front door was open, and one officer had stepped inside the apartment when defendant fired his pistol; and a civilian witness heard defendant tell an officer at the back door that he was tired of officers "trying to bust my house." Further, the probative value of this testimony was not substantially outweighed by the danger of unfair prejudice. N.C.G.S. § 8C-1, Rules 404(b), 403.

   **Am Jur 2d, Evidence §§ 327-330; Homicide § 108.**

10. **Constitutional Law § 252 (NCI4th)— State's failure to disclose evidence—evidence not material—no Brady violation**

    In a prosecution for first-degree murder of a police officer who was executing a search warrant for defendant's apartment

wherein defendant contended that he and others in his apartment did not hear the police yell, "Police, search warrant," because they were listening to a compact disc entitled "Blacktronic Science," the State did not violate *Brady v. Maryland*, 373 U.S. 83, by failing to disclose to defendant that the "Blacktronic Science" compact disc was discovered in defendant's stereo system because this evidence would not have affected the outcome of the trial and was not material where the jury heard testimony from defendant and two others that they were listening to the "Blacktronic Science" compact disc at the time police entered defendant's apartment and that the music was loud, and a visitor in another apartment testified that defendant's music was very loud that night and he did not hear the police announce their identification.

**Am Jur 2d, Evidence §§ 304, 307-312.**

**11. Searches and Seizures § 134 (NCI4th)— forced entry into defendant's apartment—lawfulness—evidence properly seized**

The trial court's findings of fact supported its conclusion that an entry by force into defendant's apartment was lawful under N.C.G.S. § 15A-251(2) on the ground that officers had probable cause to believe that the giving of further notice would endanger the lives of the officers or of others where the trial court made findings supported by evidence that officers believed a firearm was inside defendant's apartment and that defendant would not cooperate and was mean; the area outside defendant's door was so small that even though officers felt the situation was dangerous, their weapons were not drawn out of fear of harming other officers and bystanders; officers heard two arguing voices inside the apartment; and officers announced their identity by yelling "Police search" several times. The fact that officers did announce their identity and purpose does not mean that entry by force cannot be justified under N.C.G.S. § 15A-251(2) without a showing that officers reasonably believed their admittance was being denied or unreasonably delayed. Therefore, the trial court did not err by denying defendant's motion to suppress evidence seized from defendant's apartment.

**Am Jur 2d, Searches and Seizures §§ 165-170, 204-211.**

**Search warrant: sufficiency of description of apartment or room to be searched in multiple-occupancy structure. 11 ALR3d 1330.**

**STATE v. LYONS**

[340 N.C. 646 (1995)]

**Propriety of execution of search warrant at nighttime. 26 ALR3d 951.**

**What constitutes compliance with knock-and-announce rule in search of private premises—state cases. 70 ALR3d 217.**

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Rousseau, J., at the 1 November 1993 Criminal Session of Superior Court, Forsyth County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 13 April 1995.

*Michael F. Easley, Attorney General, by John G. Barnwell, Assistant Attorney General, for the State.*

*Thomas A. Fagerli for defendant-appellant.*

LAKE, Justice.

Defendant was tried capitally for the first-degree murder of Police Officer Bobby F. Beane. The jury returned a verdict of guilty of first-degree murder, but was unable to reach a unanimous sentencing recommendation. Accordingly, the trial court imposed a mandatory sentence of life imprisonment pursuant to N.C.G.S. § 15A-2000(b). We find no error and, therefore, uphold defendant's first-degree murder conviction and sentence.

At trial, evidence for the State tended to show that Senior Police Officer Bobby F. Beane of the Winston-Salem Police Department was fatally shot on 23 April 1993 while executing a search warrant for the defendant's apartment. The search warrant was issued for Apartment 540-C, Kennerly Street, based upon information given by Recio Harris to Police Officers S.A. Logan and Rick Moser, both members of the East Side Street Narcotics Intervention Unit. Harris had been arrested and charged with carrying a concealed weapon and possession of marijuana. In exchange for having the charges against him dismissed, Harris told officers he had purchased marijuana from the defendant several times. He agreed to conduct an undercover buy from defendant for the officers on 22 April 1993. Officers Logan and Moser searched Harris just prior to his entering the defendant's apartment to ensure that any illegal substances came from the defendant, and gave him $30 to buy the marijuana. Harris bought the marijuana from defendant and reported back to the officers after the buy was com-

plete. He told the officers that defendant had between three and five pounds of marijuana in his apartment, had a nasty attitude and was a "mean mother f———." Harris also felt there were firearms in the apartment. A toxicology test confirmed the substance Harris purchased from defendant was marijuana. Based upon this information, the search warrant for defendant's apartment was issued.

Officer Logan testified that at approximately 10:00 p.m. on 23 April 1993, a meeting was held in the roll call room of the Public Safety Center to discuss the execution of the search warrant. In addition to Officer Logan, Sergeant Steve Hairston, Senior Police Officer Bobby Beane, Senior Police Officer Gloria Johnson, Officer P.B. Thomas, Officer Carl McClaney, Officer L.W. Lemert, Officer Rozelle Barnes, Officer Joe Vanhook, and Officer Lela Burke were in attendance. Using a blackboard, a diagram of the layout of defendant's apartment complex was drawn to illustrate each officer's individual duties, and to show the narrow staircase the officers would have to climb to reach defendant's apartment. There was a small walkway just outside defendant's door. Because of the information supplied by Harris and the tight area in which the officers had to work, officer safety was considered to be at risk. All the officers on the team were in uniform that night and, according to Officer Logan, their "badge, name plate, [and] patches were all on our uniform." Officer Beane was selected to carry the battering ram "because Bobby was the most experienced in executing searches, and also the largest officer among our group." After the twenty-minute meeting, the team rode in the police van to Kennerly Street.

Once at the scene, Officers Lemert, Barnes and Thomas took their assigned positions at the rear of the apartment building, while Officers Beane, Johnson, Vanhook, McClaney and Logan entered the front of the building. Officer Logan led the team up the narrow stairwell with Officer Beane directly behind him. Officer Logan remembered that as the team went up the stairwell, he heard no noise and that it was very quiet. Once he reached the top of the stairs, Officer Logan pulled open the screen door to Apartment C, and it made a popping noise. Concerned he had prematurely alerted the defendant to the presence of the officers, Logan pressed his ear to the door. He heard no television or music, but he did distinctly hear two voices.

When the officers were in position, Logan stepped away from the door and yelled, "Police search," and Officer Beane hit the door with the battering ram. The door did not come open, so again Logan yelled,

"Police search," and Beane swung the battering ram. The other officers on the team were also yelling, "Police search." After the battering ram hit the door two more times, the door finally came open, and Logan entered the front room of the apartment ahead of Officer Beane. Officer Logan's service revolver was not drawn, as the area outside the apartment was very small and Logan was afraid he would be hit with the battering ram and accidentally discharge his gun. Officer Beane had both hands on the battering ram so his revolver remained in his holster as well.

Officer Logan testified he took two strides into the apartment. The door was fully open. He saw one of the three males inside move directly in front of him and then he "heard a gunshot. Felt a bullet go so close to this side of my head that the wind of it moved my hair. I smelled the smoke." Officer Logan hit the floor and dropped the search warrant he was carrying in his hand; he backed out of the apartment on his hands and knees. The search warrant was later found two feet and eight inches inside the apartment. Once outside the apartment, Officer Logan realized Officer Beane had been shot once in the head.

Senior Police Officer G.D. Johnson testified she was the supervisor for the search of defendant's apartment that night. According to Officer Johnson, it was very quiet as the search team climbed up the stairwell. Officer Johnson testified further that she heard Officer Logan yell, "Police officers, search warrant," and that each time Officer Beane swung the battering ram and the door did not come open, she also yelled, "Police, search warrant, open up." After the door came open, Officer Johnson remembered hearing a gunshot. She saw Officer Beane fall forward and then back; she was able to see he was bleeding from his left ear and forehead. Officer Johnson testified that at the time she heard the gunshot, Officer Logan was inside the apartment and she could no longer see him. Because the stairwell was so narrow, when Officer Logan backed out of the apartment, it forced the other officers on the stairwell to turn around as well. Once at the bottom of the stairs, Officer Johnson stated she took cover and watched the defendant's apartment door. One person from the apartment came outside and surrendered, and then two more people came out and surrendered.

Officer L.W. Lemert, at his position at the rear of the building, testified it was very quiet. Officer Lemert was able to hear a male voice shout, "Police, search warrant." He heard Officer Johnson sound a

radio alert, "Officer down," and Officer Lemert, confused about what had happened, ran around the side of the building and learned Officer Beane was hurt. Officer Lemert returned to the defendant's back door and a black male opened the back door to the apartment. When Officer Lemert pointed his service revolver at him, the male slammed the door.

Further testimony for the State came from Darryl Myers and Chris White who witnessed the search team pull up in a white van and surround the apartment building. Both Myers and White testified they had no difficulty in recognizing the team as police officers, and each heard officers yelling, "Police officer," several times. White testified he saw a man open the back door to defendant's apartment and heard him say to an officer, "I'm tired of ya'll trying to bust my house. Get the f— away from my door."

Police Identification Technician J.A. Hassell collected evidence from defendant's apartment that night. He recovered a .38-caliber Smith and Wesson revolver from the kitchen counter, and his examination of the revolver revealed that six rounds of ammunition were inside the gun. Of these six rounds, two were live rounds; three were misfired rounds; and one was a spent casing. The misfired rounds were located counter-clockwise from the empty cartridge case of the bullet that had been successfully fired. According to Hassell, a misfired round means that the "firing pin has struck the back of the bullet, but the projectile has not left the shell case." In other words, the trigger was pulled but these three rounds, for some reason, did not fire.

Dr. Gregory Davis, a forensic pathologist, performed an autopsy on Officer Beane. He testified that a medium caliber bullet entered Officer Beane's head, just to the right of the center of the forehead. The bullet traveled almost completely to the rear of Officer Beane's skull before it stopped. Special Agent Eugene Bishop, with the North Carolina State Bureau of Investigation, testified that the bullet recovered from Officer Beane's brain was fired from the .38-caliber revolver seized from defendant's apartment.

Among the twenty-seven items seized from the defendant's apartment that night were marijuana, several items containing crack cocaine, heroin and marijuana residue, rolling papers, a crack pot, a set of measuring spoons, a set of silver envelope scales, a small scalpel-type razor, a 12-gauge shotgun, a .38-caliber Smith and Wesson revolver, and ammunition.

STATE v. LYONS

[340 N.C. 646 (1995)]

The defendant testified on his own behalf and presented evidence tending to show that he bought the .38-caliber revolver three days before the shooting because six people armed with guns had broken into his apartment and stolen a gun, jewelry, marijuana, and some money. Defendant testified that on the night of the shooting, his brother, James Lyons, and his friend, Arthur Parks, were watching the Chicago Bulls and the Charlotte Hornets basketball game on television with defendant. After the game, defendant put a compact disc in his stereo so Parks could hear a song entitled, "Blacktronic Science." Defendant testified he turned the television down and turned the stereo up "very loud, because I was showing off." Defendant had his .38-caliber revolver in his front left pocket. Defendant testified that suddenly he heard a bang on his front door. He stated he did not hear anyone yelling, "Police, search warrant." Defendant turned the stereo down a little, and at the second bang he got up and stood face to face with the door. Defendant testified he was afraid and that he thought someone was breaking into his apartment again. Defendant decided to fire a warning shot, so he pulled his pistol and after the third bang he pulled the trigger one time. According to the defendant, the door was still closed when he fired, and he did not see Officer Logan. After he shot the pistol, defendant ran to his back door and saw an officer outside so he closed the door. According to defendant, it was only when he surrendered a few minutes later and walked outside the apartment that he realized he had shot a police officer. Defendant testified that as he surrendered to the police, he remarked, "I didn't know you all were policemen."

Defendant testified he had not shot the Smith and Wesson revolver before 23 April 1993. Defendant further testified that he was in Desert Storm, that currently he was unemployed and lived off his savings and by loaning money to people, and that he also made money from selling marijuana.

Arthur Parks also testified for the defense that he went to the defendant's apartment to listen to a compact disc entitled, "Blacktronic Science." As they were listening to the music, turned up very loud, Parks testified he heard what he thought was a knock at the door. He noticed the door "looked like it was breathing." Parks never heard anyone yell, "Police, search warrant." Parks could not tell if the door was open or shut when defendant fired his pistol.

Defendant's brother, James Lyons, testified he was at the defendant's apartment the night of the shooting. He testified that he, defend-

ant, and Parks watched the Hornets-Bulls basketball game and then listened to the "Blacktronic Science" compact disc. About halfway through the song, which he testified was turned up "pretty loud," he heard a kick at the door. James Lyons testified that "[a]t the same time as he [defendant] shot the gun, the door came open" and that he never heard anyone yell, "Police officer" or "Search warrant."

Defendant brings forward eight assignments of error.

I.

[1] In his first assignment of error, defendant contends the trial court erred in denying defendant's motion to dismiss the charge of first-degree murder based on insufficiency of the evidence.

Defendant argues that the evidence was insufficient to support a finding of premeditation, deliberation, and the specific intent to kill. Defendant asserts that because only a matter of seconds passed from the announcement of the police search and the defendant shooting his gun, it is impossible as a matter of law to conclude that defendant had enough time to premeditate. In arguing that the evidence showing deliberation was deficient, defendant contends all the evidence shows that he acted under the strong provocation of fear for himself and his property as a result of the "surprise attack by the people outside his door." Defendant contends that nowhere in the record is there substantial evidence that defendant had formulated the requisite specific intent to kill Officer Logan, but instead shot Officer Beane. Defendant concedes that there was sufficient evidence of malice arising from the use of a deadly weapon.

First-degree murder is the unlawful killing of a human being with malice, premeditation, and deliberation. N.C.G.S. § 14-17 (1993); *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). "Premeditation" means that defendant formed the specific intent to kill for a period of time, however short, before the killing. *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E.2d 791, 795 (1981). "Deliberation means that the defendant formed an intent to kill and carried out that intent in a cool state of blood, in furtherance of a fixed design for revenge or other unlawful purpose and not under the influence of a violent passion, suddenly aroused by some lawful or just cause or legal provocation." *State v. Solomon*, 340 N.C. 212, 222, 456 S.E.2d 778, 785 (1995); *see State v. Carter*, 335 N.C. 422, 429, 440 S.E.2d 268, 272 (1994).

STATE v. LYONS

[340 N.C. 646 (1995)]

We have set forth the law governing the review of challenges to the sufficiency of the evidence many times. In conducting such a review, we are bound to view the evidence in the light most favorable to the State and accord the State the benefit of every reasonable inference. *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992). Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. *Id.* "Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence." *State v. Stone*, 323 N.C. 447, 452, 373 S.E.2d 430, 433 (1988). In cases where the evidence presented is circumstantial, the court must determine whether, from the circumstances, a reasonable inference of defendant's guilt may be drawn. Once the court decides that a reasonable inference of defendant's guilt may be drawn from the circumstances, then " 'it is for the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 209 (1978) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)). Both competent and incompetent evidence must be considered. Additionally, except in those instances in which it is favorable to the State, defendant's evidence should be disregarded. *State v. Baker*, 338 N.C. 526, 558-59, 451 S.E.2d 574, 593 (1994).

Resolving all discrepancies in the evidence in favor of the State, the evidence in the present case tends to show that it was quiet as the officers approached defendant's apartment. The officers were all in full uniform and easily recognizable. Officer S.A. Logan announced the presence of the police by yelling, "Police search," several times. After several strikes with the battering ram, Officer Beane was able to get the door of the apartment open, and Officer Logan took two full strides inside the apartment before defendant shot at Officer Logan but instead hit Officer Beane. After shooting Officer Beane, defendant ran to his back door, encountered Officer L.W. Lemert, and said, "I'm tired of ya'll trying to bust my house. Get the f— away from my door." In the .38-caliber revolver, from which the fatal round was fired by defendant, there were three "misfired rounds" located counter-clockwise from the empty cartridge case of the bullet that had been successfully fired. Because Smith and Wesson .38-caliber revolvers rotate counter-clockwise, it is reasonable to conclude that defendant persistently and deliberately pulled the trigger four times, experiencing three misfires over that period of time before he was able to fire

the shot which killed Officer Beane. Officer Beane was shot just to the right of the center of his forehead.

Viewing this evidence in the light most favorable to the State, the evidence supports a reasonable inference that defendant could hear the police announcements; that defendant was well aware of what was going on and was tired of the police trying to "bust my house"; that Officer Logan was a few feet inside the apartment when defendant fired the gun; and that defendant aimed at Officer Logan and pulled the trigger a total of four times. Thus, we conclude the evidence is sufficient to show defendant acted with the specific intent to kill after premeditation and deliberation. This assignment of error is overruled.

II.

[2] By his second assignment of error, defendant argues that the trial court instructed the jury regarding the proof required for specific intent to kill, premeditation and deliberation in such a way that a reasonable juror could have thought there existed a mandatory presumption as to these elements of first-degree murder. According to defendant, this operated to relieve the State of its burden to prove each element of first-degree murder beyond a reasonable doubt.

The trial court instructed the jury in pertinent part as follows:

If the State of North Carolina proves beyond a reasonable doubt that the defendant intended to kill Logan and killed Beane with a deadly weapon, you may infer, first, that the killing was unlawful; and, second, that it was done with malice. But *you're not compelled to do so*. You may consider this along with all other facts and circumstances in determining whether the killing was unlawful and whether it was done with malice.

. . . .

. . . Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proven by circumstances from which it *may be inferred*. An intent to kill *may be inferred* from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances.

. . . .

STATE v. LYONS

[340 N.C. 646 (1995)]

Now, neither premeditation or deliberation are usually susceptible of direct proof. They *may be proved* from circumstances which *may be inferred* such as the conduct of the defendant before, during, and after the killing; the brutal or vicious circumstances of the killing; the manner in which or means by which the killing was done.

(Emphasis added.)

Defendant notes that with regard to the malice instruction, the trial court correctly included the phrase, "you are not compelled to do so." Defendant labels this a "curative phrase" and argues the phrase saved the malice portion of the jury instructions from amounting to an unconstitutional mandatory presumption. However, defendant argues that the trial court erroneously omitted this same curative phrase, "you are not compelled to do so," although it was requested, from those portions of the instructions regarding intent to kill, premeditation and deliberation. Defendant contends these omissions could have caused a reasonable juror to employ a *de facto* unconstitutional mandatory presumption as to these elements provided the State had proven the necessary predicate facts. This, according to defendant, directly resulted in an unconstitutional shifting of the burden of persuasion to defendant to disprove the elements of intent to kill, premeditation and deliberation.

The trial court instructed the jury that intent to kill, premeditation and deliberation *may* be inferred from certain relevant circumstances. These instructions were in accord with the North Carolina Pattern Jury Instructions. *See* N.C.P.I.—Crim. 206.13 (1989). We fail to find anything in the instructions which remotely suggests that the jury *must* infer intent to kill, premeditation or deliberation, thereby impermissibly establishing an unconstitutional mandatory presumption. Having reviewed the charge in its entirety, we conclude the trial court clearly and correctly instructed the jury that the State bore the burden of proving each of the elements in question. *State v. Skipper*, 337 N.C. 1, 33, 446 S.E.2d 252, 269 (1994) (involving premeditation and deliberation), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 895 (1995); *State v. Davis*, 321 N.C. 52, 59, 361 S.E.2d 724, 728 (1987). A reasonable juror could not have interpreted the instructions as given to require a mandatory presumption on the first-degree murder elements of intent to kill, premeditation or deliberation. This assignment of error is overruled.

## III.

In his third assignment of error, defendant argues that the trial court erred by refusing to instruct the jury on the theories of perfect and imperfect self-defense, voluntary and involuntary manslaughter, and imperfect defense of habitation.

### A.

**[3]** Defendant first contends he stood entitled to instructions on perfect and imperfect self-defense since the evidence warrants such instructions and since self-defense should be given when a situation evolves from one of defense of habitation against an intruder seeking entry to one in which the intruder gains access to the home, thereby converting the case to one of self-defense. Based on the facts of this case, we cannot agree.

The elements which constitute perfect self-defense are:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992) (*quoting State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572-73 (1981)); *accord State v. Maynor*, 331 N.C. 695, 699, 417 S.E.2d 453, 455 (1992). Perfect self-defense excuses a defendant altogether for a killing if all four elements above exist at the time of the killing. Imperfect self-defense renders a defendant guilty of at least voluntary manslaughter if the first two elements above exist at the time of the killing but the defendant, without murderous intent, either was the aggressor in bringing on the affray or used excessive force. *McAvoy*, 331 N.C. at 596, 417 S.E.2d at 497. This Court has set the following predicate:

[B]efore the defendant is entitled to an instruction on self-defense, two questions must be answered in the affirmative: (1) Is there evidence that the defendant in fact formed a belief that it was necessary to kill his adversary in order to protect himself from death or great bodily harm, and (2) if so, was that belief reasonable? If both queries are answered in the affirmative, then an instruction on self-defense must be given. If, however, the evidence requires a negative response to either question, a self-defense instruction should not be given.

*State v. Bush*, 307 N.C. 152, 160-61, 297 S.E.2d 563, 569 (1982). If there is no evidence from which a jury could reasonably find that defendant, in fact, believed it to be necessary to kill his adversary to protect himself from death or great bodily harm, defendant is not entitled to have the jury instructed on self-defense. *Id.* at 161, 297 S.E.2d at 569.

We hold that the evidence, taken in the light most favorable to the defendant, does not tend to show that the defendant had formed a reasonable belief that it was necessary to kill the person inside his doorway in order to save himself from death or great bodily harm; and therefore, he was not entitled to an instruction on self-defense. The defendant's evidence, considered in the light most favorable to him, tended to show that when he heard the blows on his door, he was scared and thought he was being robbed again. Defendant testified he only pulled the trigger of his .38-caliber revolver "to shoot a warning shot hoping these people would run." Defendant also testified that he "didn't intend to shoot anybody" and that his "intent was to shoot at the top of the door." Thus, from defendant's own testimony regarding his thinking at the critical time, it is clear he meant to scare or warn and did not intend to shoot anyone. There is absolutely no evidence in the record that defendant had formed a belief that it was necessary to kill in order to save himself from death or great bodily harm. *See State v. Reid*, 335 N.C. 647, 671, 440 S.E.2d 776, 789 (1994) (the first requirement of self-defense, that defendant believed it necessary to kill the deceased, is not present where defendant contended he never aimed a gun at anyone and shot only at the floor). Further, defendant's self-serving statement that he was "scared" is not evidence that defendant formed a belief that it was necessary to kill in order to save himself. *See Bush*, 307 N.C. at 159-160, 297 S.E.2d at 568 (defendant's testimony that he was "afraid" and "scared" only indicates a vague and unspecified fear or nervousness and is not evidence that defendant subjectively believed it was necessary to kill in order to protect himself from death or great bodily harm). Because no

evidence demonstrates or indicates defendant believed it necessary to kill to protect himself from death or great bodily harm, defendant was not entitled to an instruction on either perfect or imperfect self-defense. *State v. Norman*, 324 N.C. 253, 260, 378 S.E.2d 8, 12 (1989).

## B.

[4] Defendant next contends he was entitled to instructions on the lesser-included offenses of voluntary and involuntary manslaughter. Defendant argues an instruction on voluntary manslaughter was required because imperfect self-defense warrants an instruction on voluntary manslaughter; and, he acted under the adequate provocation that he mistakenly believed he was being robbed again. Defendant further argues he was entitled to an instruction on involuntary manslaughter based on substantial evidence that he recklessly discharged his .38-caliber revolver. We cannot subscribe to any of these arguments.

A trial judge is not required to instruct the jury on lesser-included offenses "when there is no evidence to sustain a verdict of defendant's guilt of such lesser degrees." *State v. Shaw*, 305 N.C. 327, 342, 289 S.E.2d 325, 333 (1982). "[V]oluntary manslaughter is an intentional killing without premeditation, deliberation or malice but done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor." *State v. Wallace*, 309 N.C. 141, 149, 305 S.E.2d 548, 553 (1983). As pointed out above, the evidence in the present case does not tend to indicate that the defendant in fact formed a belief that it was necessary to kill the deceased, thereby entitling defendant to an instruction on imperfect self-defense. Thus, defendant was not entitled to a jury instruction on voluntary manslaughter premised upon imperfect self-defense.

Assuming without deciding that defendant did act under adequate provocation when he fired his pistol, the trial court's refusal to instruct on voluntary manslaughter was nevertheless harmless error. We held in *State v. Tidwell*, 323 N.C. 668, 374 S.E.2d 577 (1989), that a trial court does not commit prejudicial error in failing to give a voluntary manslaughter instruction when a jury rejects a verdict of guilty of second-degree murder and instead finds defendant guilty of first-degree murder. *Id.* at 674-75, 374 S.E.2d at 581. In *Tidwell*, we reasoned that when a jury does "not find that defendant was in the grip of sufficient passion to reduce the murder from first-degree to

second-degree, then ipso facto it would not have found sufficient passion to find the defendant guilty only of voluntary manslaughter." *Id.* at 675, 374 S.E.2d at 581; *accord State v. Judge,* 308 N.C. 658, 664-65, 303 S.E.2d 817, 821-22 (1983). In the instant case, the trial court properly instructed the jury on first-degree and second-degree murder. After deliberations, the jury returned with a verdict of guilty of first-degree murder. Since the jury rejected second-degree murder, it would also have rejected the lesser offense of voluntary manslaughter.

**[5]** Defendant's next contention that the trial court denied him due process of law in failing to instruct the jury on involuntary manslaughter is meritless. This Court recently held in *State v. Jones,* 339 N.C. 114, 451 S.E.2d 826 (1994), *reconsideration denied,* 339 N.C. 618, 453 S.E.2d 188, *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 873 (1995), that where a jury is properly instructed on the elements of first and second-degree murder and thereafter returns a verdict of guilty of first-degree murder based on premeditation and deliberation, any error in the trial court's failure to instruct the jury on involuntary manslaughter is harmless even if the evidence would have supported such an instruction. *Id.* at 148-49, 451 S.E.2d at 844; *accord State v. Hardison,* 326 N.C. 646, 392 S.E.2d 364 (1990); *State v. Young,* 324 N.C. 489, 380 S.E.2d 94 (1989). As stated above, the jury in the present case returned a verdict of guilty of first-degree murder based on premeditation and deliberation. In reaching this verdict, the jury found a specific intent to kill, formed after premeditation and deliberation. Such a finding necessarily precludes a finding that the killing was the result of an accident or an act of criminal negligence. Therefore, error, if any, in the trial court's failure to instruct the jury as to involuntary manslaughter was necessarily harmless.

C.

**[6]** Lastly, as to this third assignment of error, defendant contends the trial court denied him due process of law when it failed to instruct the jury on voluntary manslaughter based upon imperfect defense of habitation.

Defendant acknowledges that this Court has not recognized imperfect defense of habitation as a principle of justification or exculpation but urges that this case is the proper case for such recognition. Defendant argues that the facts of this case lead to the logical conclusion that defendant defended his home, although unreasonably, since the evidence can be interpreted as showing that the police

announced their presence such that defendant could or should have heard, but that defendant, nervous and on edge because of "past robberies," did not believe the announcement and unreasonably believed the police were would-be robbers. Defendant thus argues that the language "voluntary manslaughter is also committed if the defendant . . . unreasonably defended his home" should have been inserted into the pattern jury instruction on voluntary manslaughter and given to the jury.

Defense of habitation is available to a defendant when the defendant has acted "to *prevent* a forcible entry into the habitation under such circumstances . . . that the [defendant] reasonably apprehends death or great bodily harm to himself or other occupants at the hands of the assailant or believes that the assailant intends to commit a felony." *State v. McCombs*, 297 N.C. 151, 156-57, 253 S.E.2d 906, 910 (1979). Under such circumstances, the use of deadly force in defense of habitation is justified. *Id.* at 156, 253 S.E.2d at 910. It is true this Court has not recognized the theory of imperfect defense of habitation, and we decline the invitation to do so now.

The trial court did instruct the jury on the defense of habitation as follows:

> The defendant was justified in using deadly force only to prevent a forcible entry into his home and only if the defendant reasonably believed that such force was necessary to prevent the entry and the circumstances at the time were such that he, that is the defendant, reasonably feared death or great bodily harm to himself or other occupants of the home at the hands of the person seeking entry or he reasonably believed such person intended to commit a felony in the home. It is for you the jury to determine the reasonableness of the defendant's apprehension or belief from the circumstances as they appeared to him there that night on April 23, 1993.

This instruction informed the jury that the defendant was justified in using deadly force if he acted in defense of habitation and was more favorable to defendant than the instruction he requested. Further, while defendant styles his argument as requesting this Court to recognize imperfect defense of habitation, his actual argument does not speak to this proposition. Defendant's argument, premised upon the fact that the evidence could show that his belief in the need to defend his habitation was unreasonable, addresses instead the threshold requirement for defense of habitation. Defendant argues that while he

could or should have heard the police announce their presence, he unreasonably thought he was being fooled. This admission effectively negates defendant's entitlement to *any* instruction on defense of habitation from the outset since his belief in the need to prevent forcible entry was not reasonable.

Even so, we take this opportunity to reject the theory of imperfect defense of habitation. As a unanimous Court said through Justice Branch (later Chief Justice), "[O]ne of the most compelling justifications for the rules governing defense of habitation is the desire to afford protection to the occupants of a home under circumstances which might not allow them an opportunity to see their assailant or ascertain his purpose, other than to speculate from his attempt to gain entry by force that he poses a grave danger to them." *McCombs*, 297 N.C. at 157, 253 S.E.2d at 910. It is this Court's opinion that to subdivide or diffuse the defense of habitation into theories of perfect and imperfect defense of habitation is contrary to and would distract from the clear and basic justifications behind the defense.

This assignment of error is overruled.

IV.

[7] In defendant's fourth assignment of error, he argues that the trial court erred by instructing the jury upon the doctrine of transferred intent. Defendant argues there was no substantial evidence showing that defendant intended to kill Officer Logan but instead killed Officer Beane. Rather, on this point, defendant contends the evidence shows that after Officer Logan gained entry into defendant's apartment, the gun was pointed in Officer Logan's direction, but defendant never pulled the trigger when he had Officer Logan in his sights. Defendant asserts here that it is only logical to "assume" that if defendant had intended to kill Officer Logan, he would have done so. He contends that because he never intended to kill Officer Logan, the instruction concerning transferred intent was erroneous.

We note first that the defendant did not designate this particular argument as an assignment of error in the record. The rule of appellate procedure designating this Court's scope of review is clear. "Except as otherwise provided herein, the scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal in accordance with this Rule 10." N.C. R. App. P. 10(a). Thus, this argument is beyond our scope of review. Even if we were to overlook the procedural defect in this appeal pursuant to

Rule 2 of the Rules of Appellate Procedure, defendant would not be entitled to relief as the record reveals defendant himself made a formal, written request for an instruction regarding transferred intent. "A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C.G.S. § 15A-1443(c) (1988). This assignment of error is overruled.

V.

**[8]** In his fifth assignment of error, defendant argues the trial court abused its discretion and violated defendant's right to due process by denying defendant's motions for the use of a jury questionnaire, and for individual, sequestered jury *voir dire*. Defendant points to the example of one juror, who had been passed by both sides as an acceptable juror, to bolster his argument. During a break in jury *voir dire* after her selection, this particular juror approached the bailiff and told him that her children had been molested and that she needed to pick them up after school as she had great fear of an unauthorized person picking the children up after school. She told the bailiff she had not wanted to divulge this in the courtroom earlier. The bailiff promptly brought this information to the attention of the trial court who, in an exercise of discretion, excused this juror from duty. Defendant argues this juror illustrates and makes his argument that the trial court's denial of the motion for a questionnaire, and individual, sequestered *voir dire* "destroyed any chance of the defendant learning about the people who would decide his guilt or innocence and ultimately if he would live or die."

The applicable statute provides: "In capital cases the trial judge for good cause shown may direct that jurors be selected one at a time, in which case each juror must first be passed by the State. These jurors may be sequestered before and after selection." N.C.G.S. § 15A-1214(j) (1988). A trial court's ruling on whether to grant sequestration and individual *voir dire* of prospective jurors will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Reese*, 319 N.C. 110, 353 S.E.2d 352 (1987).

In any instance, it is entirely speculative that a prospective juror would only be honest and candid through sequestered questioning and in response to a questionnaire. *See State v. Johnson*, 298 N.C. 355, 259 S.E.2d 752 (1979). Defendant points to no question on his questionnaire which would have likely elicited this information, and defendant also makes no showing that he was in any way prohibited from asking prospective jurors, individually, the same questions set

out in his questionnaire. *See State v. Fisher*, 336 N.C. 684, 693-94, 445 S.E.2d 866, 871, *reconsideration denied*, 337 N.C. 697, 448 S.E.2d 535 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 665 (1995). The record reveals that jurors were asked by the trial court to inform the court if they had any undue hardships which would prevent them from serving on this case. The juror defendant sets out as an example correctly informed the bailiff, who correctly relayed the information to the trial court. Defendant's argument that there *may* have been other jurors with undetected biases or difficulties is entirely speculative. Defendant fails to show an abuse of discretion. This assignment of error is without merit.

VI.

[9] Next, defendant assigns error to the admission of testimony from Recio Harris. Harris testified for the State that he had purchased marijuana from the defendant the day before the shooting. This evidence was received for the limited purpose of showing that the defendant had a motive for the shooting. Immediately after Harris' testimony, the trial court gave an appropriate limiting instruction informing the jury it could only consider the testimony as evidence of motive. Defendant argues this testimony was impermissible character evidence under N.C.G.S. § 8C-1, Rule 404(b) and, additionally, that the evidence fails to survive the balancing test in N.C.G.S. § 8C-1, Rule 403.

Rule of Evidence 404(b) sets forth the general rule that evidence of "other crimes, wrongs, or acts" may not be admitted as character evidence in order to prove actions in conformity. Such evidence "may, however, be admissible for other purposes, such as proof of *motive*, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1992) (emphasis added).

Defendant concedes at the outset that Rule 404(b) is a rule of inclusion. Indeed we have stated that Rule 404(b) is "subject to but *one exception* requiring [the] exclusion [of evidence] if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 279, 389 S.E.2d 48, 54 (1990).

The State's theory of the case was that defendant, as a known drug dealer, had a motive to kill a law enforcement officer. The State's evidence tended to show that the officers yelled, "Police, search war-

rant," and that no officer heard music coming from inside the apartment. The officers were in uniform, the door was fully open, and Officer Logan was inside the apartment when defendant fired his pistol. A civilian witness testified he heard defendant say to Officer Lemert, who was stationed outside defendant's back door, "I'm tired of ya'll trying to bust my house. Get the f— away from my door." In such a context, it was not an abuse of discretion for the trial court to allow evidence that the defendant was a drug dealer to show motive for the shooting. *See State v. Ligon*, 332 N.C. 224, 235, 420 S.E.2d 136, 142 (1992) (evidence that defendant dealt drugs properly admitted to show motive under Rule 404(b) where State contended the victim was shot when he tried to steal cocaine from defendant). The trial court correctly issued, upon defendant's request, a limiting instruction cautioning the jury that such evidence could only be considered as proof of motive and for no other purpose. The jury was additionally warned by the trial court that it could not "convict the defendant for murder solely on the basis of him having sold marijuana in the past." We conclude it was not error for the trial court to allow evidence that defendant sold drugs as proof of motive pursuant to Rule 404(b).

Further, we cannot say the probative value of the evidence was "substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (1992). Certainly, most evidence tends to prejudice the party against whom it is offered. However, to be excluded under Rule 403, the probative value of the evidence must not only be outweighed by the danger of unfair prejudice, it must be *substantially* outweighed. In light of the trial court's careful and thorough limiting instruction, we conclude that the probative value of Harris' testimony to show motive was not substantially outweighed by the dangers of unfair prejudice. This assignment of error is overruled.

## VII.

**[10]** In his seventh assignment of error, defendant argues that the State withheld evidence exculpatory to the defendant in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963), thereby entitling him to a new trial.

At trial, defendant produced evidence that he, Arthur Parks, and James Lyons did not hear the police yell, "Police, search warrant," because they were listening to a compact disc entitled "Blacktronic Science." The defendant's stereo system was seized as evidence by the police department. Pursuant to discovery, the stereo system was

available for inspection by defendant, but the defendant was unable to open the compact disc player. Defendant filed a motion pursuant to *Brady* for production by the State of any exculpatory evidence. After defendant rested his case, he learned that a few days prior to his resting, the stereo system was opened successfully by Detectives Young and Chapple. The "Blacktronic Science" compact disc was found inside. The trial court refused to allow defendant to reopen his case and introduce the "Blacktronic Science" compact disc as an exhibit. Defendant then moved for a mistrial based upon the failure of the State to produce this allegedly exculpatory evidence as required by *Brady*. This motion was also denied.

*Brady* provides "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218. The United States Supreme Court defined evidence as material only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494 (1985). "In determining whether the suppression of certain information was violative of the defendant's right to due process, the focus should not be on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, but rather should be on the effect of the nondisclosure on the outcome of the trial." *State v. Alston*, 307 N.C. 321, 337, 298 S.E.2d 631, 642 (1983). The defendant has the burden of showing that the evidence not disclosed was material and affected the outcome of the trial. *Id.* In this instance, we find the defendant has failed to carry his burden of showing how the evidence was material, as defined, so as to trigger the State's duty to disclose under *Brady*.

The record reveals that the defendant offered evidence to the jury through the testimony of the defendant himself, Arthur Parks, and James Lyons, that they were listening to the "Blacktronic Science" compact disc just prior to the police entering the apartment. All three testified the music was loud. Defendant was able to present further testimony from Ernest Cameron, Jr. that at the time of the shooting, Cameron was visiting his friend downstairs in Apartment B. Cameron testified that defendant's music was very loud that night and that he did not hear the police yelling, "Police, search warrant." In light of the

evidence presented at trial, we find that the State did not violate *Brady* by not disclosing to the defendant that "Blacktronic Science" was found inside the stereo. The jury heard testimony from no less than four witnesses that defendant was playing music the night of the murder and that the music was very loud. The evidence material to the defendant's case was that loud music was playing which prevented defendant's hearing the police identification. The exact title of the compact disc is not material in and of itself; rather, it is simply corroborative of the material fact that music was playing. In view of the material evidence that was received and heard by the jury, there is no reasonable probability that had this evidence of the compact disc been disclosed, the outcome of the trial would have been different. Therefore, we conclude this evidence was not material and the State was under no duty, pursuant to *Brady*, to reveal to defendant that the "Blacktronic Science" compact disc was discovered in the stereo system. This assignment of error is overruled.

## VIII.

**[11]**  In his last assignment of error, defendant argues the trial court erred by denying defendant's motion to suppress evidence seized in the defendant's apartment.

Defendant filed a motion to suppress evidence seized from his apartment arguing that the police failed to announce their presence and purpose as required by N.C.G.S. § 15A-249, and that the entry by force was not justified as the police had no reasonable basis to believe their entry was being denied or unreasonably delayed as required by N.C.G.S. § 15A-251(1). A *voir dire* was conducted at trial, after which the trial court made the following detailed findings of fact: that on 22 April 1993, Officer Logan conducted an undercover buy at the premises of the defendant at 540-C Kennerly Street and that the items purchased were analyzed and found to be marijuana; that the police informant told Officer Logan that the defendant had between three and five pounds of marijuana in his apartment; that defendant had a nasty attitude; that defendant was a mean mother f———, and that the informant would not be surprised if defendant had a firearm in the apartment; that Officer Logan had executed between twenty and twenty-five search warrants; that at the planning session prior to the execution of the search warrant in this case, Officer Logan apprised the team of what he knew of the situation at defendant's apartment; that it was Officer Logan's opinion that defendant would not cooperate; that a firearm was inside the apart-

ment; that the team would have to go up a stairwell of about fifteen steps to reach defendant's apartment; that an adjoining apartment was close by; that it was a small area in which to operate; and that officer safety was at stake. The trial court further found as fact the following: that the officers approached the apartment silently, three to the back door and five to the front; that Officer Logan did not have his weapon drawn, though he thought the situation was dangerous, because he thought the gun might accidently discharge since he was too close to the battering ram and other officers; that Officer Logan pulled open the screen door to the apartment, and it made a popping sound; that Officer Logan was afraid the defendant had been alerted to their presence, so Officer Logan put his ear to the door and heard two arguing voices; that prior to that time, Officer Logan had not heard any radio or television, and the apartment and surrounding area seemed very quiet; that Officer Logan hollered, "Police search," and Officer Beane hit the door with the battering ram; that Officer Logan again hollered, "Police search," and Officer Beane again hit the door with the battering ram; that other officers were also hollering, "Police search"; that after some three or four strikes with the battering ram, the door came open; that once the door opened, Officer Logan took two steps inside the apartment, heard gunfire, began to back out of the apartment on his hands and knees, and then realized Officer Beane had been shot; and that Officer Logan left the search warrant inside the apartment. After making these findings of fact, the trial court then concluded as a matter of law that probable cause existed for Officer Logan to believe that by giving more warning, an officer's or some other person's life would be in danger; and therefore, the officers' entry by force into defendant's apartment at 540-C Kennerly Street was lawful. Accordingly, the trial court denied defendant's motion to suppress.

Defendant contends that the findings of fact are erroneous as they are not supported by the evidence. However, defendant fails entirely to point to a single, specific finding of fact which he alleges is unsupported by the evidence; rather, he makes a broadside attack on the findings of fact in general. Findings of fact are binding on appeal if supported by competent evidence. *State v. Howell*, 335 N.C. 457, 468, 439 S.E.2d 116, 122 (1994). Conclusions of law, however, are fully reviewable. *State v. Barber*, 335 N.C. 120, 436 S.E.2d 106 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 865 (1994). We conclude that the findings of fact were supported by competent evidence in the record. Thus, they are binding on this Court. Accordingly, the issue

facing this Court upon review is whether the trial court's findings of fact support the conclusions of law drawn therefrom.

The trial court concluded as a matter of law that probable cause existed for Officer Logan to believe that by giving more warning, an officer's or some other person's life would be in danger; and therefore, the officers' entry by force into defendant's apartment at 540-C Kennerly Street was lawful. Under N.C.G.S. § 15A-251, a police officer may enter a premises by force in order to execute a warrant only if: (1) the officer complies with N.C.G.S. § 15A-249 by announcing his identity and purpose and reasonably believes his admittance is being denied or unreasonably delayed; or (2) "the officer has probable cause to believe that the giving of notice would endanger the life or safety of any person." N.C.G.S. § 15A-251(1), (2) (1988).

Defendant appears to argue that since a portion of the evidence shows the officers announced their identity and purpose, a forced entry could only be justified in this case if the officers reasonably believed their admittance was being denied or unreasonably delayed under N.C.G.S. § 15A-251(1). Defendant points out that the trial court's conclusion of law was that Officer Logan had probable cause to believe that the giving of more notice would endanger the lives of the officers or of others, thereby justifying forceful entry under N.C.G.S. § 15A-251(2). Under this subsection, no announcement of identity and purpose is required, only exigent circumstances. Thus, defendant contends the findings of fact do not support the trial court's conclusion of law and it follows then, according to defendant, that the fruits of the search should have been suppressed.

We conclude that the trial court's findings of fact do support the conclusion of law that Officer Logan had probable cause to believe that the giving of further notice would endanger the lives of the officers or of others; and therefore, entry by force was lawful. The fact that the officers did announce their identity and purpose does not mean entry by force cannot be justified under N.C.G.S. § 15A-251(2). We find nothing in the statute to forbid an announcement of police presence and purpose when officers also face exigent circumstances.

Furthermore, such an announcement does not, under these facts, lead to the conclusion that exigent circumstances did not exist. The trial court's findings of fact included that the officers believed a firearm was inside defendant's apartment; that defendant would not cooperate and was mean; that the area outside defendant's door was so small that even though officers felt the situation was dangerous,

their weapons were not drawn out of fear of harming other officers and bystanders; and, that Officer Logan heard two arguing voices inside the apartment. These findings of fact support the conclusion of law that entry by force was justified, as officers had probable cause to believe that the giving of further notice would endanger the lives of the officers or others. Under these circumstances, the trial court properly denied the defendant's motion to suppress evidence seized from defendant's apartment. This assignment of error is overruled.

For the foregoing reasons, we conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.