STATE OF NORTH CAROLINA v. KEITH ANTONIA WAGNER

No. 338A95

(Filed 10 May 1996)

**1. Evidence and Witnesses § 1353 (NCI4th)— detective's notes of confession—unsigned by defendant—admissibility**

A detective's handwritten notes of an interview of defendant containing the detective's questions and defendant's answers was properly admitted into evidence in defendant's murder trial, although the notes were not reviewed and signed by defendant, where the detective testified that the notes constituted an exact word-for-word rendition of his interview of defendant, and any unrecorded conversation that took place between the detective and defendant was unrelated to the questioning of defendant. Furthermore, the notes were not inadmissible because they contained a comment by the detective that defendant appeared to be bragging when he stated that he would have used a more powerful gun if he had intended to kill anyone, since the detective could testify as to what he observed about defendant's demeanor during the interrogation.

**Am Jur 2d, Evidence §§ 716, 717.**

**STATE v. WAGNER**

[343 N.C. 250 (1996)]

**Admissibility in evidence of unsigned confession. 23 ALR2d 919.**

2. **Criminal Law § 497 (NCI4th)— exhibit in jury room—objection by defendant—harmless error**

The trial court erred by allowing four of the five pages of a handwritten narrative of defendant's statements to a detective to be taken into the jury room during deliberations in a first-degree murder trial over defendant's objection and without his consent. However, this error was not prejudicial where the exhibit had already been admitted into evidence and was consistent with defendant's trial testimony, and there were no comments favorable to defendant on the fifth page of the exhibit that defendant had not made earlier in his statements to the detective. N.C.G.S. § 15A-1233(b).

**Am Jur 2d, Trial §§ 1665 et seq.**

**Permitting documents or tape recordings containing confessions of guilt or incriminating admissions to be taken into jury room in criminal case. 37 ALR3d 238.**

3. **Homicide § 706 (NCI4th)— first-degree murder—failure to instruct on voluntary manslaughter—error cured by verdict**

Even if it was error for the trial court to fail to instruct the jury on voluntary manslaughter in this first-degree murder prosecution, this error was harmless where the trial court properly instructed on first-degree and second-degree murder, and the jury found defendant guilty of first-degree murder.

**Am Jur 2d, Homicide §§ 529 et seq.**

**Modern status of law regarding cure of error, in instruction as to one offense, by conviction of higher or lesser offense. 15 ALR4th 118.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Griffin, J., at the 23 January 1995 Criminal Session of Superior Court, Pender County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment for discharging a firearm into occupied property was allowed 23 August 1995. Heard in the Supreme Court 13 March 1996.

STATE v. WAGNER

[343 N.C. 250 (1996)]

*Michael F. Easley, Attorney General, by Ronald M. Marquette and Thomas F. Moffitt, Special Deputy Attorneys General, for the State.*

*Neil D. Weber and Daniel Shatz for defendant-appellant.*

FRYE, Justice.

Defendant, Keith Antonia Wagner, was indicted on 30 August 1993 for first-degree murder and discharging a firearm into occupied property. In a noncapital trial, the jury found defendant guilty of discharging a firearm into occupied property and first-degree murder on the theories of premeditation and deliberation and felony murder. On 26 January 1995, the trial court entered judgments imposing sentences of three years' imprisonment for discharging a firearm into occupied property and life imprisonment for the first-degree murder conviction.

On appeal to this Court, defendant makes three arguments. After reviewing the record, transcript, briefs, and oral arguments of counsel, we conclude that defendant received a fair trial, free of prejudicial error.

The evidence presented at trial tended to show the following facts and circumstances: In the early morning hours of 17 August 1993, Annette Miller (the victim) died from a gunshot wound to her right temple. Defendant, who had been "romantically involved" with the victim, resided with his mother in a trailer approximately one thousand feet from the scene of the crime. The bullet removed from the victim's temple was consistent with having been fired by a .22-caliber rifle found in defendant's mother's trailer shortly after the victim was shot. Defendant admitted to the police that he had fired the rifle "in the air" from a roadway near Bernadette McKnight's trailer, where the victim's body was found.

Defendant and the victim had been involved in a quarrel earlier that evening at McKnight's trailer. The victim and McKnight confronted defendant about their belief that he had made a pass at Theresa Jordan, who was also present at McKnight's trailer. After speaking alone with the victim and denying that the accusations were true, defendant became angry and decided to leave McKnight's trailer. Witnesses testified that, as defendant was leaving the trailer, he said "I'm going to kill all you m—— f——s in here" and that defendant looked at Theresa Jordan and said, "Especially you, bitch."

STATE v. WAGNER

[343 N.C. 250 (1996)]

McKnight followed defendant as he left the trailer and said, "Please don't shoot my house. My kids are in there. . . . Calm down, calm down, please calm down." McKnight pulled on defendant's clothing, and he came out of his shirt and his jogging pants. Operaus McKnight, McKnight's brother, and Edison Jordan came outside of the trailer a few minutes later. A fight ensued. Operaus McKnight and Edison Jordan knocked defendant to the ground and punched him. As McKnight asked her brother and Edison Jordan to stop fighting, defendant ran away.

When defendant departed, McKnight made everyone, except the victim and her (McKnight's) children, leave the trailer. McKnight then went to find someone to watch her children and to telephone the police. When McKnight left the trailer, the victim was watching television. McKnight heard one gunshot while she was walking to her sister's house and heard at least two gunshots after she entered her sister's house. McKnight called the police and then returned to her trailer.

On the way back to her trailer, McKnight saw defendant at a neighbor's trailer. Defendant was carrying a rifle. Defendant told McKnight, "I done shot up some s— in your trailer and you're next." When McKnight returned to her trailer, she found the victim on the floor. McKnight observed two bullet holes in her trailer, one in the front window and another near the front door light switch.

Shortly thereafter, defendant rode up to the trailer with his mother, who asked McKnight what had happened. When McKnight told defendant's mother that defendant had shot the victim, his mother responded that defendant could not have shot the victim because he was at home with her. Witnesses testified that when defendant exited his mother's car, he yelled, "Any other of you m—— f————s wanna die tonight?" Everyone ran because they thought defendant may have had a gun.

Defendant and his mother left the crowd at the trailer park at about 4:30 a.m. Defendant's mother drove defendant to the Pender County Sheriff's Department to report the assault on defendant by Operaus McKnight and Edison Jordan that took place earlier that morning at McKnight's trailer. Defendant gave the following statement to the police about the assault:

When [McKnight's] brother and the other guy approached me and jumped on me, then they told me if I came back, don't come back

shooting B.B.s, so I went home and got a .22 shooting in the air. I didn't see anyone. Whatever happened after I got home. I don't know.

Meanwhile, officers had responded to McKnight's trailer to investigate the shooting. While defendant and his mother were at the Sheriff's Department, an officer called and asked defendant's mother if she would come home and give them the rifle that defendant had been carrying earlier that morning. Defendant's mother left the Sheriff's Department, went to her trailer, consented to a search by an officer, retrieved the rifle for the officer, and gave it to him. The officer, Detective Ezzell, gave defendant's mother a receipt for the rifle. Defendant's mother and Detective Ezzell then returned to the Sheriff's Department.

Defendant's mother and Detective Ezzell arrived at the Sheriff's Department with the .22-caliber rifle at about 6:20 a.m. Detective Ezzell arrested defendant and charged him with murder. Detective Ezzell then questioned defendant about the shooting of Annette Miller and recorded in longhand his questions and defendant's answers. Defendant stated that he shot his rifle "in the air" but that he had not intended to shoot anyone; that he had heard voices inside the trailer before and after the shots were fired; that, after the second shot, he entered the trailer and saw the victim lying on the floor but that he did not think she was dead or had been shot; that, if he did shoot her, he was sorry; that he did not think a .22-caliber bullet could do so much damage; and that, if he had intended to shoot someone, he would have used a more powerful gun.

Defendant testified at trial that he had been drinking on the evening of 16 August 1993 and had smoked marijuana prior to arriving at McKnight's trailer at about 9:00 p.m. He admitted that he and the victim were both "in a rage" over her accusation that he had made advances toward Theresa Jordan. He testified that all he wanted was to go home and "chill out." Defendant further testified that, when he left the trailer, he was intoxicated and did not recall exactly what he said as he was leaving but that he may have told Theresa Jordan that he was going "to get her."

Defendant also testified that, after McKnight attempted to restrain him and after Operaus McKnight and Edison Jordan beat him, he ran home, got his rifle, returned to McKnight's trailer after about five minutes, and fired his rifle twice into the air. Defendant admitted telling Detective Ezzell that he heard voices coming from the trailer

and stated that it could have been the television. He testified that he was angry but did not see anyone at whom he was angry and did not intend to kill anyone. Defendant admitted to telling McKnight when he saw her shortly after he had fired the rifle that he had "shot up something." However, he did not recall making any hostile statement to the crowd outside of the trailer when he arrived with his mother and did not recall telling McKnight that he was going to shoot her next.

Defendant's mother testified that, when she first saw defendant on 17 August 1993, he had been badly beaten and was swollen and scratched. She further testified that defendant did not have a gun. She also testified that she left her trailer with defendant to report the assault to the police.

The trial court denied defendant's motions to dismiss made at the close of the State's evidence and again at the close of all the evidence.

[1] Defendant first assigns as error the trial court's admission into evidence, over defendant's objection, of State's Exhibit 29, a handwritten rendition of defendant's interview with Detective Ezzell containing Detective Ezzell's questions and defendant's answers. In addition to moving to suppress the statement on *Miranda* grounds, defendant objected to the admission of the detective's notes on the grounds that the notes were not acknowledged by defendant, contained editorial comments by the detective, and did not constitute a complete word-for-word rendition of the interview. Defendant argues that he was never afforded the opportunity to review the notes from the interview or to sign the notes to acknowledge their accuracy.

In *State v. Walker*, 269 N.C. 135, 152 S.E.2d 133 (1967), this Court set out the legal principles for the admissibility of a statement reduced to writing. This Court stated:

"A confession which has been wholly or partially reduced to writing is ordinarily admissible against an accused where it was freely and voluntarily made by him, regardless of the fact that it was reduced to writing by another person, where it was read over to or by accused, or was translated to him, and signed or otherwise admitted by him to be correct." 23 C.J.S., Criminal Law 833(a).

"If a statement purporting to be a confession is given by accused, and is reduced to writing by another person, before the written instrument will be deemed admissible as the written con-

fession of accused, he must in some manner have indicated his acquiescence in the correctness of the writing itself. If the transcribed statement is not read by or to accused, and is not signed by accused, or in some other manner approved, or its correctness acknowledged, the instrument is not legally, or *per se*, the confession of accused; and it is not admissible in evidence as the written confession of accused." 23 C.J.S., Criminal Law 833(b).

*Walker*, 269 N.C. at 139, 152 S.E.2d at 137. We further stated, "There is a sharp difference between reading from a transcript which, according to sworn testimony, records the exact words used by an accused, and reading a memorandum that purports to be an interpretative narration of what the officer understood to be the purport of statements made by the accused." *Id.* at 141, 152 S.E.2d at 138.

Defendant acknowledges that the Court of Appeals has noted a limited exception where an officer's notes are a verbatim record of the questions and answers between the officer and the defendant and are not merely the officer's impression of the import of defendant's statements. *See State v. Byers*, 105 N.C. App. 377, 413 S.E.2d 586 (1992). However, defendant argues that the notes admitted into evidence did not constitute an exact word-for-word rendition of his interview with Detective Ezzell in that it was incomplete. Defendant notes that Detective Ezzell admitted on *voir dire* that additional conversations took place between himself and defendant which were not reduced to writing. Defendant argues that to allow an officer to determine which portions of a defendant's statement to reduce to writing amounts to editorial input into the contents of the writing.

Additionally, defendant argues that the notes contain an editorial comment by the detective that defendant "appear[ed] to be bragging" when he stated that if he had intended to kill anyone, he would have used a more powerful gun. Defendant contends that Detective Ezzell's interpretation of defendant's words, which tend to support his claim that he had no specific intent to kill or discharge a firearm into the dwelling, completely undercuts the impact of defendant's statement. Defendant further notes that when the jury requested the statement be sent into the jury room during deliberations, the court removed the page containing Detective Ezzell's editorial comment, stating, "I don't think that would be appropriate."

In the instant case, unlike in *Walker*, Detective Ezzell testified that the exhibit introduced into evidence was an exact word-for-word rendition of his interview of defendant. We conclude that *Walker* does

not preclude admission of an unsigned statement taken in longhand of a defendant's actual responses to the recorded questions. After carefully reviewing the transcript of the *voir dire* of Detective Ezzell, we conclude that any unrecorded conversation that took place between Detective Ezzell and defendant was unrelated to the questioning of defendant. Detective Ezzell testified that defendant was belligerent and accused the officers of framing him. This conversation, which took place prior to the conclusion of defendant's statement, was not a part of the questioning. Further, we conclude that Detective Ezzell could testify as to what he observed about defendant's demeanor during the interrogation when he commented that defendant appeared to be bragging. Accordingly, we reject this assignment of error.

[2] Defendant next assigns as error the trial court's allowing the jury to take four of the five pages of State's Exhibit 29 into the jury room during deliberations. The jurors had sent a note to the trial court requesting that they be given photographs, diagrams, reports, and statements to take into the jury room for use in their deliberations. Defendant objected to State's Exhibit 29, the handwritten narrative of defendant's statement given to Detective Ezzell, being sent into the jury room because it contained Detective Ezzell's editorial comment that defendant appeared to be bragging when he said that if he had intended to kill anyone, he would have used a more powerful gun. The trial court determined that it would be inappropriate for the jury to have the fifth page of the five-page statement since it contained the detective's comment. Accordingly, the trial court gave the jury the first four pages of the statement. Defendant contends that giving this material to the jury, over his objection, was prejudicial error.

N.C.G.S. § 15A-1233 provides in pertinent part:

(b) Upon request by the jury and with consent of all parties, the judge may in his discretion permit the jury to take to the jury room exhibits and writings which have been received in evidence. If the judge permits the jury to take to the jury room requested exhibits and writings, he may have the jury take additional material or first review other evidence relating to the same issue so as not to give undue prominence to the exhibits or writings taken to the jury room. If the judge permits an exhibit to be taken to the jury room, he must, upon request, instruct the jury not to conduct any experiments with the exhibit.

N.C.G.S. § 15A-1233(b) (1988).

Defendant contends that the judge may permit the jury to take exhibits into the jury room only with the consent of *all* parties. In *State v. Platt*, 85 N.C. App. 220, 228, 354 S.E.2d 332, 337, *disc. rev. denied*, 320 N.C. 516, 358 S.E.2d 529 (1987), the Court of Appeals said:

> N.C. Gen. Stat. § 15A-1233(b) authorizes a judge to allow the jury to take into the jury room exhibits and writings which have been admitted into evidence when the jury so requests and the parties give their consent. *State v. Taylor*, 56 N.C. App. 113, 287 S.E.2d 129 (1982). Defendant here objected to the jury's taking this statement into the jury room, and the court thus violated G.S. § 15A-1233(b) in allowing the exhibits to go into the jury room. *Id.*

In the instant case, defendant objected to State's Exhibit 29 being allowed into the jury room during deliberations. We conclude that the trial court erred in allowing the exhibit to be taken into the jury room during deliberations over defendant's objection and without his consent.

We now consider whether this error was prejudicial. Such error is prejudicial only if defendant can meet his burden of showing that there is "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1988). Defendant argues that this error was compounded by the fact that in allowing the jury to take State's Exhibit 29 into the jury room during deliberations, the trial court removed a page from the exhibit which, along with Detective Ezzell's inappropriate editorial comment, contained several statements which supported defendant's contentions regarding his lack of intent to shoot the deceased or anyone else. We disagree.

Defendant's objections at trial to allowing the exhibit to go to the jury room were based on grounds that the statement constituted hearsay and that it was not a signed statement of defendant. We conclude that defendant has failed to show prejudice. The statement submitted to the jury during its deliberations had already been admitted into evidence and was consistent with defendant's testimony at trial. Further, there were no comments favorable to defendant on the fifth page of the statement that defendant had not made earlier in the statement. Accordingly, we find no prejudicial error.

[3] Defendant next assigns as error the trial court's failure to instruct the jury on voluntary manslaughter. We conclude that it is unnecessary to decide whether the evidence supported a voluntary

manslaughter instruction. Assuming *arguendo* it was error not to instruct the jury on voluntary manslaughter, a review of the possible verdicts submitted to the jury and the jury's ultimate verdict reveals that such error was harmless. The trial court instructed the jury that it could find defendant (1) guilty of first-degree murder, based either on the theory of malice, premeditation, and deliberation or the theory of felony murder; (2) guilty of second-degree murder; or (3) not guilty. After deliberations, the jury returned a verdict finding defendant guilty of first-degree murder on both theories submitted. "Since the jury rejected second-degree murder, it would also have rejected the lesser offense of voluntary manslaughter." *State v. Lyons*, 340 N.C. 646, 664, 459 S.E.2d 770, 779 (1995). Thus, even if it was error to fail to instruct the jury in this case regarding voluntary manslaughter, such error was not prejudicial.

NO ERROR.