STATE OF NORTH CAROLINA v. JOHN EXCELL McCOMBS, JR.

No. 29

(Filed 20 April 1979)

**Homicide § 28.4— defense of habitation—deceased in defendant's home—no duty to retreat—jury instructions proper**

The use of deadly force in defense of the habitation is justified only to *prevent* a forcible entry into the habitation under such circumstances that the occupant reasonably apprehends death or great bodily harm to himself or other occupants at the hands of the assailant or believes that the assailant in-tends to commit a felony, but once the assailant has gained entry, the usual rules of self-defense replace the rules governing defense of habitation with the exception that there is no duty to retreat; therefore, where the evidence tend-ed to show that deceased had entered defendant's home, was proceeding down the hall and was within three feet of defendant when the fatal shot was fired, the trial judge properly instructed that defendant was under no duty to retreat and correctly left it to the jury to determine whether, under the facts

and circumstances found by the jury, the State had proved beyond a reasonable doubt that defendant did not act in self-defense.

APPEAL by the State from the decision of the Court of Appeals reported in 38 N.C. App. 214, 247 S.E. 2d 660 (1978), finding error in the trial before *Baley, S.J.*, at the 1 November 1976 Session of PERSON Superior Court.

Defendant was charged in separate bills of indictment with first degree murder, possession with intent to distribute marijuana, possession of lysergic acid diethylamide, and manufacturing marijuana. The cases were consolidated for trial, and defendant entered a plea of not guilty to each charge.

The State offered evidence tending to show that on 29 April 1976 at approximately 9:20 p.m. Larry D. Bullock and four other officers of the City of Durham's Narcotics Squad armed with a search warrant proceeded to Apartment L-5 at 410 Pilot Street in Durham for the purpose of searching that apartment for marijuana. The officers were operating unmarked automobiles and were dressed in blue jeans and denim jackets. After Officer Bullock knocked on the door of the apartment, defendant came to the front window, raised a sheet which was hanging over the window and looked toward Officer Bullock. He dropped the sheet, and the officers immediately heard running steps. Some ten or fifteen seconds later the officers called out, "Police officers, search warrant." Upon hearing no response, Bullock kicked the door open, and the officers again identified themselves as policemen with a search warrant. Officer Bullock proceeded through the living room to a hallway, where defendant, who was standing in the doorway to his bedroom or in the hallway, shot and fatally wounded him.

Sandra Yvonne Gaither testified that she, defendant and other persons were in defendant's bedroom. She was watching television, and defendant was working at his desk. There was a knock at the front door, and defendant left the room. She heard voices saying, "Police officers." Defendant then came back to the bedroom and obtained a pistol from the windowsill. Shortly thereafter, she heard a shot, and she ran into the bedroom closet.

The police officers searched the apartment and seized a quantity of marijuana, a pair of scales, some marijuana stems, and a vial of lysergic acid diethylamide.

State v. McCombs

The State offered expert testimony to the effect that Officer Bullock died as a result of a gunshot wound in his chest.

Defendant offered evidence to the effect that he was in his bedroom studying at about 9:25 p.m. when he heard a knock on the front door of his apartment. He went to the front window and observed a black man dressed in blue jeans. Since he did not know this person, he started to his roommate's bedroom to ask him if he knew the person standing at the front door. He then heard a "banging" on the door and thereupon went to his own room where he obtained a pistol. He returned to the doorway of the bedroom and fired at a man armed with a pistol who was proceeding from the living room toward him. He was about three feet from this man when he fired. He never heard anyone identify himself as a policeman until after he had fired the shot.

Defendant also offered evidence tending to show that he bore a good reputation.

The jury returned verdicts of guilty of murder in the second degree and guilty as charged on all other counts. Judge Baley imposed a sentence of imprisonment for a term of sixty years on the verdict of guilty of second degree murder. He sentenced defendant to imprisonment for a term of five years on the charge of possession of marijuana with intent to distribute to commence at the expiration of the sentence pronounced in the second degree murder case. On the verdicts of guilty of possession of lysergic acid diethylamide and manufacturing marijuana, defendant was sentenced to imprisonment for five years on each count to run concurrently with the sentences imposed in the murder case and the case of possession of marijuana with intent to distribute.

Defendant appealed and the Court of Appeals granted a new trial on the homicide charge for error in the trial judge's instructions. The State pursuant to G.S. 7A-31 petitioned this Court to certify for discretionary review that portion of the decision of the Court of Appeals which ordered a new trial in the homicide case. We granted the State's petition on 5 January 1979.

*Rufus L. Edmisten, Attorney General, by T. Buie Costen, Special Deputy Attorney General, and Nonnie F. Midgette, Assistant Attorney General, for the State.*

*C. C. Malone, Jr., and Albert L. Willis for defendant appellant.*

BRANCH, Justice.

The single question before us for decision is whether the Court of Appeals erred in granting a new trial on the ground that the trial court failed to give a full instruction on the defense of home and property. In his oral argument, defense counsel conceded, and properly so, that the trial judge in all other respects correctly charged on self-defense. In the admittedly correct charge on self-defense, the trial judge, in part, charged:

> . . . If defendant reasonably believed that a murderous assault was being made upon him in his own home, he was not required to retreat but could stand his ground and use whatever force he reasonably believed to be necessary to save himself from death or great bodily harm. It is for you, the jury, to determine the reasonableness of the defendant's belief, from the circumstances as they appeared to him at the time. . . .

The right to defend one's habitation has been considered by this Court on many occasions, and there is little difficulty in stating the rules formulated by the Court. However, we believe the right is more limited than the decision of the Court of Appeals would indicate. The distinction between defense of habitation and ordinary self-defense has become somewhat blurred due to the varied factual situations in which these defenses arise. We must, therefore, review some of the applicable rules of law.

In *State v. Gray*, 162 N.C. 608, 77 S.E. 833 (1913), the deceased and two other persons in the nighttime came to defendant's home which was occupied by defendant, his wife and children. The intruders, who were cursing and using threatening language, tried to force an entrance into the house thereby terrifying the occupants of the household. Defendant observed a pistol in the hand of deceased and heard a shot. He asked deceased and his companions to leave, but deceased replied that he was coming in. Defendant then obtained his shotgun and shot deceased as he raised his foot to kick out a window. At trial, the judge charged the jury as follows:

> The court charges you that if you find from the evidence that the deceased came with three other young men to the home of the defendant and began shooting and cursing on the

porch of defendant's house, and threatened defendant, and refused to leave when ordered, and was attempting with violence to force an entrance into defendant's home, and that defendant had reasonable grounds to believe and did believe that he or some member of his family was in danger of losing their lives or suffering great bodily harm at the hands of the deceased, then defendant had a right to defend his house even to the extent of taking the life of the deceased; and if you further find from the evidence that defendant shot deceased, believing from the surrounding circumstances and the conduct of deceased that it was necessary to do so to protect himself or his family, then you should find the defendant not guilty.

However, the court further charged that the above instruction should be considered by the jury "only in the event that they should find that one of the men on the porch was armed with a pistol. 'If one was not armed with a pistol, you should not consider this; for the court charges you that if one was not armed with a pistol, there is no evidence of the use of gentle means by defendant.' "

In holding this charge to be erroneous, this Court stated:

The guilt or innocence of the defendant does not depend upon the presence of a pistol in the hands of the deceased, as stated by his Honor, but in the existence of a reasonable apprehension that he or some member of his family was about to suffer great bodily harm, or of the reasonable belief that it was necessary to kill in order to *prevent* the violent and forceful entry of an intruder into his home. [Emphasis added.]

* * *

Mr. Wharton, in his work on Criminal Law, 9th Ed., vol. 1, sec. 503, says: "An attack on the house or its inmates may be resisted by taking life. The occupant of a house has a right to resist even to the death the *entrance* of persons attempting to force themselves into it against his will, when no action less than killing is sufficient to defend the house from entrance. A man's house, however humble, is his castle, and his castle he is entitled to protect against *invasion*," and the same doctrine is enunciated in Bishop's New Criminal Law,

vol. 1, sec. 858; Hale's Pleas of the Crown, vol. 1, sec. 458. [Emphasis added.]

The principle that one does not have to retreat regardless of the nature of the assault upon him when he is in his own home and acting in defense of himself, his family and his habitation is firmly embedded in our law. *State v. Anderson,* 222 N.C. 148, 22 S.E. 2d 271 (1942); *State v. Bryson,* 200 N.C. 50, 156 S.E. 143 (1930). However, this rule does not allow one to use excessive force in repelling an attack, and whether excessive force is used is a question for the jury. *State v. Robinson,* 188 N.C. 784, 125 S.E. 617 (1924); *State v. Cox,* 153 N.C. 638, 69 S.E. 419 (1910).

In *State v. Miller,* 267 N.C. 409, 148 S.E. 2d 279 (1966), the distinction between the rules governing defense of habitation and ordinary self-defense was clarified. There Justice Sharp (now Chief Justice) wrote:

When a trespasser enters upon a man's premises, makes an assault upon his dwelling, and attempts to force an entrance into his house in a manner such as would lead a reasonably prudent man to believe that the intruder intends to commit a felony or to inflict some serious personal injury upon the inmates, a lawful occupant of the dwelling may legally *prevent* the entry, even by the taking of the life of the intruder. Under those circumstances, "the law does not require such householder to flee or to remain in his house until his assailant is upon him, but he may open his door and shoot his assailant, if such course is apparently necessary for the protection of himself or family. . . . But the jury must be the judge of the reasonableness of defendant's apprehension". [Emphasis added.]

It is important to note that in *State v. Miller, supra,* this Court for the first time stated that "the rules governing the right to defend one's *habitation* against *forcible entry by an intruder* are substantially the same as those governing his right to defend himself."

The North Carolina cases indicate that the use of deadly force in defense of the habitation is justified only to *prevent* a forcible entry into the habitation under such circumstances (e.g., attempted entry accompanied by threats) that the occupant rea-

sonably apprehends death or great bodily harm to himself or other occupants at the hands of the assailant or believes that the assailant intends to commit a felony. *See, State v. Miller, supra* (attempted forcible entry accompanied by threat to "tear the place up"); *State v. Spruill*, 225 N.C. 356, 34 S.E. 2d 142 (1945) (attempted forcible entry); *State v. Baker*, 222 N.C. 428, 23 S.E. 2d 340 (1942) (attempted forcible entry accompanied by threat to kill); *State v. Gray, supra* (attempted forcible entry accompanied by threat to kill).

In our opinion, one of the most compelling justifications for the rules governing defense of habitation is the desire to afford protection to the occupants of a home under circumstances which might not allow them an opportunity to see their assailant or ascertain his purpose, other than to speculate from his attempt to gain entry by force that he poses a grave danger to them. Once the assailant has gained entry, however, the usual rules of self-defense replace the rules governing defense of habitation, with the exception that there is no duty to retreat. 40 Am. Jur. 2d *Homicide*, Sec. 174 (1968). This is so because the occupant is then better able to ascertain whether the assailant intends to commit a felony or possesses the means with which to inflict serious personal injury upon the occupants of the dwelling.

Our conclusion that defense of habitation is available only in limited circumstances is further supported by the fact that different rules apply to invasions not accompanied by danger to the occupants. In this regard, it is well settled that a person is entitled to defend his property by the use of reasonable force, subject to the qualification that, in the absence of a felonious use of force on the part of the aggressor, human life must not be endangered or great bodily harm inflicted. *State v. Lee*, 258 N.C. 44, 127 S.E. 2d 774 (1962); *Curlee v. Scales*, 200 N.C. 612, 158 S.E. 89 (1931). Likewise, when a trespasser invades the premises of another, the latter has the right to remove him, and the law requires that he should first request him to leave, and if he does not do so, he should lay his hands gently upon him, and if he resists, he may use sufficient force to remove him, taking care, however, to use no more force than is necessary to accomplish that object. *State v. Crook*, 133 N.C. 672, 45 S.E. 564 (1903); *State v. Taylor*, 82 N.C. 554 (1880). Should we extend the availability of the defense of habitation to cover *any* invasion of the home, every oc-

cupant who kills a person present in his home without authorization would be entitled to an instruction on defense of habitation. Such extension is both unwarranted and unnecessary. The previously cited cases dealing with defense of habitation are factually limited to the *prevention* of a forcible entry. Moreover, the rules governing defense of habitation, self-defense, defense of property, and eviction of trespassers are designed to allow an individual to defend his family, home and property in virtually any situation which might arise with respect to an invasion of his home while at the same time affording maximum protection of human life. To allow the distinctions between these rules to become blurred or to extend any of them to situations for which they were not intended would dilute the safeguards designed to protect human life.

It is apparent that the distinction between the rules governing defense of habitation and self-defense in the home is a fine one indeed. As we have noted, however, the importance of the distinction between the two lies in the different factual situations to which each applies. What constitutes "reasonable apprehension" in the face of an attempted forcible entry into one's home may well differ from that which constitutes "reasonable apprehension" when one is face to face with his assailant. We are of the opinion that a defendant is entitled to the benefit of an instruction on defense of habitation where he has acted to *prevent* a forcible entry into his home. Such an instruction would be more favorable to a defendant than would an instruction limited to self-defense. We are aware that occurrences necessitating such instruction may be rare indeed. We do not think it prudent, however, to abandon the rules governing defense of habitation and rely, for the sake of simplicity, solely on the rules of self-defense.

In instant case, the facts show that defendant did not shoot Bullock to *prevent* an entry into his habitation. Bullock had entered the door, crossed the living room, was proceeding down the hall and was within three feet of defendant when the fatal shot was fired. Under these circumstances, only the rules of self-defense were applicable, except that there was no duty upon defendant to retreat. The trial judge clearly charged on the exception that defendant was under no duty to retreat and correctly left it to the jury to determine whether, under the facts and cir-

cumstances found by the jury, the State had proved beyond a reasonable doubt that defendant did not act in self-defense.

We, therefore, hold that under the facts of this case the trial judge's charge was adequate. The decision of the Court of Appeals is

Reversed.