STATE OF NORTH CAROLINA v. THEODORE HEDGEPETH

No. 7910SC1085

(Filed 6 May 1980)

**Homicide § 28.4— defense of habitation—necessity for instruction**

　　The trial court in a second degree murder case erred in failing to charge the jury on defense of habitation where there was evidence tending to show that defendant was an 81 year old man in poor health; deceased was a fugitive from a mental institution, his age was in the forties, and he weighed 178 pounds; defendant ordered deceased to leave his home after deceased had threatened defendant's life and defendant had retreated into his home; deceased warned defendant of his intent to return and kill him; deceased thereafter came onto the porch of defendant's home, stuck his head around the door frame, and renewed his threats; defendant shot deceased when deceased again stuck his head around the door frame; and defendant's wife and six month old granddaughter were also in the home.

APPEAL by defendant from *McLelland, Judge.* Judgment entered 10 July 1979 in Superior Court, WAKE County. Heard in the Court of Appeals 26 March 1980.

The defendant Theodore Hedgepeth is an eighty-one year old retired farmer, in poor health, having suffered a stroke within the past two years. He was tried on an information charging him with the second degree murder of James Newkirk, having voluntarily waived the finding and return of a true bill. Decedent was a man in his forties, five feet nine inches tall, and weighed 178 pounds. He was a fugitive patient from Dorothea Dix Hospital. The jury returned a verdict of guilty of voluntary manslaughter, and the judge sentenced defendant to an active sentence of five years. Defendant appealed.

*Attorney General Edmisten, by Assistant Attorney General James Peeler Smith, for the State.*

*McDaniel & Heidgerd, by C. Diederich Heidgerd; and J. Franklin Jackson, for defendant appellant.*

HILL, Judge.

Although defendant brings forward three assignments of error, we conclude that one is dispositive of this case. The following facts appear of record:

The defendant and the decedent met at a county filling station, went to an A.B.C. store, purchased a quart of whiskey which they began drinking, and then went to the defendant's home, a four-room frame dwelling with a small foyer and front porch. The foyer abutted defendant's bedroom. Defendant's wife was somewhere about the premises, and a six-month old granddaughter was lying on a bed in the house. The decedent went into the house and brought the baby onto the porch. Defendant directed the decedent to take the baby back into the house because the weather was cool. Decedent returned the baby, came back to the porch and as he passed the defendant on an apparent course toward his car, told defendant: "I will come back here in the house and kill you." When he said that, decedent was standing in the yard. The defendant testified that when Newkirk came from inside the house back to the porch he was acting funny; he acted like he ". . . was gonna make a break and jump on me." Defendant further testified that he had never ". . . seen the decedent act like that. He was acting like the fool there all at once."

The defendant went into the house and told decedent to get in his car and leave, to go on home. Defendant testified, "[I] heard something walking on the porch I thought it was my wife. I thought maybe he [decedent] had done gone home, and I see a big black face peeping in there at me." Defendant also testified that, "After I told him to leave he just kept coming. He would peep his head around [the door frame] and then go back. I couldn't see his body part." Defendant stated at various points in his testimony that, "The first time [decedent] stuck his head in and I loaded my gun . . . ." "I was scared of him . . . ." "He said I'm gonna kill you when he stuck his head in the door, and he took his head back, and I couldn't see it . . . ." "When he peeped around I shot him in the neck because it is the only thing I could see." "I was scared of him." "I was looking after my house when I shot Mr. Newkirk."

There were blood spots on the refrigerator on the porch, on the floor of the porch, going down the steps, and on the gun barrel. The decedent's body had a wound of approximately one and one-fourth to one and one-half inches in diameter, indicating he was shot from a distance of about six or seven feet.

A psychiatrist from Dorothea Dix Hospital testified the decedent was suffering from psychotic depression and would have been unpredictable without his medication, and that when drinking alcohol would have been impulsive. The petition for admission to Dorothea Dix Hospital indicated Mr. Newkirk had been threatening his thirteen-year-old daughter and that he said he needed to kill.

The court charged the jury on the doctrine of self-defense within the home. The defendant contends he was entitled to a charge on defense of his habitation. We concur in the defendant's contention.

Justice Branch (now Chief Justice) summarized the holdings of the North Carolina courts in the areas of self-defense within the dwelling and the doctrine of defense of habitation in the case of *State v. McCombs*, 297 N.C. 151, 253 S.E. 2d 906 (1979), in which he points out at page 158:

> It is apparent that the distinction between the rules governing defense of habitation and self defense in the home is a fine one indeed. As we have noted, however, the importance of the fine distinction between the two lies in different factual situations to which each applies. What constitutes 'reasonable apprehension' in the face of an attempted forcible entry into one's home may well differ from that which constitutes 'reasonable apprehension' when one is face to face with his assailant. We are of the opinion that a defendant is entitled to the benefit of an instruction on defense of habitation when he has acted to *prevent* [emphasis added] a forcible entry into his home. Such an instruction would be more favorable to a defendant than would an instruction limited to self defense.

In the same case, Justice Branch cites, as follows, on page 156:

> In *State v. Miller*, 267 N.C. 409, 148 S.E. 2d 279 (1966), the distinction between the rules governing defense of habitation and ordinary self-defense was clarified. There Justice Sharp (now Chief Justice) wrote:
>
> > When a trespasser enters upon a man's premises, makes an assault upon his dwelling, and attempts to force an entrance into his house in a manner such as

would lead a reasonably prudent man to believe that the intruder intends to commit a felony or to inflict some serious personal injury upon the inmates, a lawful occupant of the dwelling may legally *prevent* the entry, even by the taking of the life of the intruder. Under those circumstances, 'the law does not require such householder to flee or to remain in his house until his assailant is upon him, but he may open his door and shoot his assailant, if such course is apparently necessary for the protection of himself or family. . . . But the jury must be the judge of the reasonableness of defendant's apprehension.' [Emphasis added.]

It is important to note that in *State v. Miller*, supra, this Court for the first time stated that 'the rules governing the right to defend one's *habitation* against *forcible entry by an intruder* are substantially the same as those governing his right to defend himself.'

The facts of the case *sub judice* require a holding that defendant is entitled to a charge on defense of habitation. We are aware that ". . . one of the most compelling justifications for the rules governing defense of habitation is the desire to afford protection to the occupants of a home under circumstances which might not allow them an opportunity to see their assailant or ascertain his purpose, other than to speculate from his attempt to gain entry by force that he poses a grave danger to them." *McCombs, supra*, at 157. We do not read *McCombs* as limiting the defense to that situation. Instead, the defense is limited to the situation where one shoots in order to prevent a forcible entry into his habitation.

Although defined as defense of habitation, the defense in reality is that of defense of person, for under no circumstances is the taking of life available as a defense for protecting property. We cannot believe the fear aroused in an occupant of a dwelling caused by one attempting to enter whose identity and motive are uncertain is greater than the fear experienced when a fugitive from a mental institution threatens to cross the threshold and threaten the life of the occupant.

The defendant had ordered Newkirk from the premises after his life was threatened and he had retreated into his house, be-

lieving the deceased had gone. By refusing to leave the defendant's yard and returning to the porch of the house, the deceased became a trespasser, an intruder attempting a forcible entry. The deceased had warned the defendant of his intent to return and kill him, thereafter coming onto the porch and renewing the threats and sticking his head around the threshold of the door. When we consider the size of the aggressor, his age, his threats, and his "funny actions" in contrast to the age, health, frailty and circumstances of the defendant and his right to protect himself, his infant grandchild and his wife, we conclude it is a jury question upon a proper charge whether defendant was acting within the framework of the defense of habitation when he shot the decedent.

The other issues raised by the defendant are moot in the light of our decision. We conclude the defendant is entitled to a

New trial.

Judges MARTIN (Robert M.) and WEBB concur.