IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-337

Filed 7 May 2024

Lincoln County, Nos. 17CRS053125-26

STATE OF NORTH CAROLINA

            v.

RONALD WAYNE VAUGHN, JR.

Appeal by Defendant from judgments entered 24 November 2021 by Judge R. Gregory Horne in Lincoln County Superior Court. Heard in the Court of Appeals 23 January 2024.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General John R. Green, Jr., for the State-Appellee.*
>
> *Anne Bleyman for Defendant-Appellant.*

COLLINS, Judge.

Defendant Ronald Vaughn, Jr., appeals from judgments entered upon guilty verdicts of first-degree murder and possessing a weapon of mass death and destruction. Defendant argues that the trial court erred by denying his requested jury instructions on the stand-your-ground provision and defense of habitation as to the first-degree murder charge, and the defense of justification as to the possession of a weapon of mass death and destruction charge.

In light of the Supreme Court's decision in *State v. McLymore*, 380 N.C. 185,

868 S.E.2d 67 (2022), we hold that the trial court erred by denying Defendant's requested jury instruction on the stand-your-ground provision and that Defendant has met his burden of showing that the error was prejudicial. However, the trial court did not err by denying Defendant's requested jury instruction on the defense of habitation. Defendant is entitled to a new trial for the first-degree murder charge.

Furthermore, the trial court did not err by denying Defendant's requested jury instruction on the defense of justification, and we find no error in Defendant's conviction for possession of a weapon of mass death and destruction. Nonetheless, because Defendant's pre-trial confinement credit was assigned to the vacated first-degree murder judgment, we remand the possession of a weapon of mass death and destruction judgment for resentencing after his new trial so that his credits may be properly applied.

## I. Background

The evidence at trial tended to show the following: Kimberly Ingram was the owner of a single-wide trailer in Lincolnton. Defendant rented the trailer from Ingram and lived there with two roommates. Ingram's son, Gary Somerset, was friends with Defendant and had been temporarily staying at the trailer for approximately a month.

On 25 August 2017, Defendant and Somerset were visiting Defendant's mother's residence. During this time, Ingram texted Defendant and asked him to call her. Ingram told Defendant that her boyfriend had choked her, and Defendant told

her that she could stay at the trailer. Somerset was very upset and told Defendant's mother that "if he found out that . . . guy put his hands on his mama he was going to kill him." Defendant and Somerset returned to the trailer to meet Ingram. Defendant, Somerset, and Ingram were sitting in the living room and "[t]hings just started escalating"; Ingram said something that made Somerset mad about "an abusive situation with an ex-boyfriend," and then "names were being thrown around."

Defendant, Somerset, and Ingram then left the trailer for approximately twenty minutes to "calm down in a car ride[.]" During the car ride, Defendant told Somerset "that no one in his family loved him, that he didn't have anywhere to stay, that his own sister wouldn't let [him] stay with [her], and that 'Your own mother doesn't even care you about [sic].'" Ingram told Defendant that his statements were not true, that she loved Somerset, and that Somerset could stay anywhere she stayed. Defendant told Ingram that she should be more appreciative, and Ingram responded, "What? I don't think so. Wait a minute. This is getting way out of hand." Ingram then stated, "You know what? I think it's best if you guys move because I'm going to have to have my house back because I can't live with you all like this."

At that point, they pulled into the driveway. Ingram wrote Defendant a notice to vacate the trailer and handed it to him as he exited the car. Defendant "ripped it up [and] threw it in the air right in front of [Ingram's] face." Defendant stood on the porch and continued to argue with Ingram and Somerset as they sat in the car. Defendant "told them to leave multiple times, but they still weren't leaving."

Defendant eventually went inside the trailer and locked and latched the screen door. Defendant retrieved his iPad from the kitchen and tried to call 911, but his iPad "would not cooperate with [him.]" Defendant yelled, "Does anyone have a phone[,]" but "[n]o one answered [him]." Defendant "felt [he] had to grab something . . . [and] couldn't find any of the other things that [he] had intentionally just deliberately left lying around in case[.]" There was a lock-blade knife in the kitchen and an axe in the living room, but Defendant did not see those "in the panic." Defendant walked through the kitchen and living room and into the back bedroom where his roommate was sitting. The closet in the back bedroom was secured by a combination lock and contained a Winchester .410 caliber shotgun with a sawed-off barrel. Defendant attempted to unlock the closet but could not remember the combination. Defendant's roommate input the combination, retrieved the shotgun, and handed it to Defendant.

Defendant walked back through the trailer, unlocked the screen door, and returned to the porch. Defendant then stated, "You all need to leave. You all should have done left. You all know you need to leave." After that, "there was still some more arguing and screaming about who was the rightful owner of the house and who needed to get out." Defendant asked Ingram and Somerset if they could talk and "let everything be okay[,]" and Ingram responded, "No, . . . it is what it is. I've got to have my house back." Defendant then said to her, "You're just a bitch." Somerset told Defendant not to disrespect Ingram, and Defendant replied, "She's a f[**]king bitch."

At that point, Somerset exited the car, took his shirt off, yelled, "Let's end this[,]" and rushed towards Defendant. When Somerset was approximately five feet away, Defendant shot him in the chest with the shotgun. Somerset died at the scene.

A search warrant was subsequently issued for the trailer. A Winchester .410 caliber shotgun with a sawed-off barrel was found under a pillow on the bed in the back bedroom, and Winchester .410 shotgun shells were found on a coffee table in the living room. The length of the shotgun barrel was 9.87 inches, and the overall length was 17.22 inches.

Defendant was indicted for first-degree murder and possessing a weapon of mass death and destruction. The matter came on for trial on 15 November 2021. The jury returned guilty verdicts of first-degree murder and possessing a weapon of mass death and destruction. The trial court sentenced Defendant to life imprisonment without parole for first-degree murder and a concurrent sentence of 16 to 29 months of imprisonment for possessing a weapon of mass death and destruction. Defendant appealed.

## II.    Discussion

### A. Stand-Your-Ground Provision/Defense of Habitation

Defendant argues that the trial court erred by denying his requested jury instructions on the stand-your-ground provision and the defense of habitation as to the first-degree murder charge.

"The jury charge is one of the most critical parts of a criminal trial." *State v.*

*Walston*, 367 N.C. 721, 730, 766 S.E.2d 312, 318 (2014). "It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Hamilton*, 262 N.C. App. 650, 660, 822 S.E.2d 548, 555 (2018) (quotation marks and citation omitted). "Where competent evidence of self-defense is presented at trial, the defendant is entitled to an instruction on this defense, as it is a substantial and essential feature of the case[.]" *State v. Lee*, 370 N.C. 671, 674, 811 S.E.2d 563, 566 (2018) (quotation marks, brackets, and citations omitted). In determining whether competent evidence sufficient to support a self-defense instruction has been presented, the evidence is taken as true and considered in the light most favorable to the defendant. *State v. Coley*, 375 N.C. 156, 159, 846 S.E.2d 455, 457 (2020). "Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence." *State v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974) (citations omitted). "[A] defendant entitled to *any* self-defense instruction is entitled to a *complete* self-defense instruction, which includes the relevant stand-your-ground provision." *State v. Bass*, 371 N.C. 535, 542, 819 S.E.2d 322, 326 (2018).

We review a trial court's decisions regarding jury instructions de novo. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). An error in jury instructions is prejudicial and requires a new trial if "there is a reasonable possibility that, had the error in question not been committed, a different result would have been

reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2023). The burden to show prejudice is on the defendant. *Id.*

"[A]fter the General Assembly's enactment of [N.C. Gen. Stat.] § 14-51.3, there is only one way a criminal defendant can claim perfect self-defense: by invoking the statutory right to perfect self-defense. Section 14-51.3 supplants the common law on all aspects of the law of self-defense addressed by its provisions." *State v. McLymore*, 380 N.C. 185, 191, 868 S.E.2d 67, 72 (2022). N.C. Gen. Stat. § 14-51.4 applies to "[t]he justification described in . . . [N.C. Gen. Stat.] § 14-51.3." N.C. Gen. Stat. § 14-51.4 (2023). Accordingly, "when a defendant in a criminal case claims perfect self-defense, the applicable provisions of [N.C. Gen. Stat.] § 14-51.3—and, by extension, the disqualifications provided under [N.C. Gen. Stat.] § 14-51.4—govern." *McLymore*, 380 N.C. at 191, 868 S.E.2d at 73.

Under N.C. Gen. Stat. § 14-51.3, "[a] person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that the conduct is necessary to defend himself . . . or another against the other's imminent use of unlawful force." N.C. Gen. Stat. § 14-51.3(a) (2023). N.C. Gen. Stat. § 14-51.3 also codifies the stand-your-ground provision and provides, in pertinent part, that a person is justified in using deadly force and has no duty to retreat in any place he has the lawful right to be if: (1) he "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself . . .

or another[,]" or (2) "[u]nder the circumstances permitted pursuant to [N.C. Gen. Stat. §] 14-51.2." *Id.*

N.C. Gen. Stat. § 14-51.2 codifies the defense of habitation and provides, in pertinent part, that "the lawful occupant of a home . . . is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself . . . or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if" (1) "[t]he person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered . . . [the] home[,]" and (2) "[t]he person who uses defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred." N.C. Gen. Stat. § 14-51.2(b) (2023). The relevant distinction between the two statutes is that a rebuttable presumption arises that the lawful occupant of a home reasonably fears imminent death or serious bodily harm when using deadly force at home under the circumstances in section 14-51.2(b) while this presumption does not arise in section 14-51.3(a)(1). *Lee*, 370 N.C. at 675, 811 S.E.2d at 566.

However, the justification described in the stand-your-ground provision and the defense of habitation "is not available to a person who used defensive force and who . . . [w]as attempting to commit, committing, or escaping after the commission of a felony." N.C. Gen. Stat. § 14-51.4(1). In *State v. Crump*, this Court held that N.C. Gen. Stat. § 14-51.4(1) "does not require a causal nexus between the disqualifying

felony and the circumstances giving rise to the perceived need for the use of force[.]" 259 N.C. App. 144, 145, 815 S.E.2d 415, 417 (2018), *rev'd on other grounds*, 376 N.C. 375, 851 S.E.2d 904 (2020), and *overruled by State v. McLymore*, 380 N.C. 185, 868 S.E.2d 67. The Supreme Court reversed *Crump* on other grounds without addressing whether a causal nexus between the disqualifying felony and the circumstances giving rise to the perceived need for the use of force was required. *See Crump*, 376 N.C. at 393, 851 S.E.2d at 918. Subsequently, however, in *McLymore*, the Supreme Court overruled *Crump* on the causal nexus issue, holding that "in order to disqualify a defendant from justifying the use of force as self-defense pursuant to [N.C. Gen. Stat.] § 14-51.4(1), the State must prove the existence of an immediate causal nexus between the defendant's disqualifying conduct and the confrontation during which the defendant used force." 380 N.C. at 197, 868 S.E.2d at 77. To do so, "[t]he State must introduce evidence that but for the defendant attempting to commit, committing, or escaping after the commission of a felony, the confrontation resulting in injury to the victim would not have occurred." *Id.* at 197-98, 868 S.E.2d at 77 (quotation marks and citation omitted). Where the State introduces such evidence, the existence of a causal nexus is a jury determination and the trial court must instruct the jury that "the State [is required] to prove an immediate causal nexus between a defendant's attempt to commit, commission of, or escape after the commission of a felony and the circumstances giving rise to the defendant's perceived need to use force." *Id.* at 187, 868 S.E.2d at 70.

Here, this Court's decision in *Crump* was the controlling precedent on the causal nexus issue at the time of trial as the Supreme Court's opinion in *McLymore* had not yet been issued. Thus, the trial court and the parties did not have the benefit of *McLymore* when this case was tried. The following discussion regarding the stand-your-ground provision, defense of habitation, and disqualifying felony took place during the charge conference:

> [THE STATE]: But I also think that under 14-51.4 [Defendant] is not allowed to have the stand-your-ground provision or defense of habitation because he was, number one, committing a felony at the time by possessing a weapon of mass death and destruction; and, number two, he provoked the use of force against him or herself by the statements that he made prior to using them. So I think that they get a self-defense instruction, but I don't think they get the instruction for 51.2 and 51.3 based on the plain language of 14-51.4.
>
> THE COURT: [Defense counsel], I'll hear you on that.
>
> [DEFENSE COUNSEL]: The people on this side do not love the *Crump* decision obviously. The *Crump* decision, I think in overbroad language by its terms sounds like it wipes out self-defense entirely. I'm thankful the [c]ourt is not taking that direction. But it does in interpreting 14-51.4 squarely point to 14-51.2 and 14-51.3 and says those justifications are not available . . . . And so if the [c]ourt finds that the evidence in this case in the light most favorable does not support the instruction because of *Crump*, then that is where it lands. However, we contend that *Crump* is written overbroadly and the self-defense itself survives.
>
> . . . .
>
> THE COURT: . . . . [M]y understanding of *Crump* is just that, that I believe self-defense survives, but obviously we have the prohibition with regard to those other defenses.
>
> Did you wish to be heard further about that, [defense

counsel]?

> [DEFENSE COUNSEL]: I do not. I cannot make an argument interpreting *Crump* other than it's blocking 14-51.2 and .3 through 51.4. I want to and I don't see it.

After taking the matter under advisement overnight and further discussion the following morning, the trial court declined to give instructions on the stand-your-ground provision and the defense of habitation.

### 1. *Stand-Your-Ground Provision*

In light of the Supreme Court's decision in *McLymore*, the trial court erred by concluding that Defendant's possession of a weapon of mass death and destruction categorically disqualified him under N.C. Gen. Stat. § 14-51.4(1) from a jury instruction on the stand-your-ground provision and by failing to instruct the jury that "the State must prove the existence of an immediate causal nexus between the defendant's disqualifying conduct and the confrontation during which the defendant used force." *Id.* at 197, 868 S.E.2d at 77.

Furthermore, Defendant has met his burden of showing a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial. First, the State specifically referenced the stand-your-ground provision during closing arguments and explicitly, yet erroneously, instructed the jury that it does not apply in this case:

> Now, let's talk about the law for just a minute. You heard during the opening remarks from His Honor about the potential defenses in this case. And I want to be clear before you go back there because you all are citizens, and

> I'm sure you all watch the news. And there's a lot of things in the headlines right now, especially right now. But this case and the law that you're going to hear is not -- I repeat not -- stand your ground. And the law you're going to hear in this case is not -- I repeat not -- the castle doctrine. Under our law in the state of North Carolina, it does not apply in this case, so you're not going to hear about it. The only law you're going to hear is the common law defense of self-defense. . . .

Additionally, the evidence viewed in the light most favorable to Defendant could have supported a jury determination that Defendant's use of deadly force was justified and that there was no causal nexus between the disqualifying felony and his use of deadly force. The evidence at trial tended to show that Defendant, Somerset, and Ingram were sitting in the living room and "[t]hings just started escalating[,]" and then "names were being thrown around." They left the trailer for approximately twenty minutes to "calm down in a car ride" but continued to argue in the car. Ingram told Defendant during the car ride that he needed to move out of the trailer. After pulling into the driveway, Ingram wrote Defendant a notice to vacate the trailer and handed it to him as he exited the car. Defendant "ripped it up [and] threw it in the air right in front of [Ingram's] face." Defendant stood on the porch and continued to argue with Ingram and Somerset as they sat in the car. Defendant "told them to leave multiple times, but they still weren't leaving."

Defendant eventually went inside the trailer and locked and latched the screen door. Defendant retrieved his iPad from the kitchen and tried to call 911, but his iPad "would not cooperate with [him.]" Defendant "felt [he] had to grab something . . .

[and] couldn't find any of the other things that [he] had intentionally just deliberately left lying around in case[.]" Defendant retrieved the Winchester .410 caliber shotgun with a sawed-off barrel from the back bedroom.

Defendant returned to the porch and said, "You all need to leave. You all should have done left. You all know you need to leave." After that, "there was still some more arguing and screaming about who was the rightful owner of the house and who needed to get out." Defendant asked Ingram and Somerset if they could talk and "let everything be okay[,]" and Ingram responded, "No, . . . it is what it is. I've got to have my house back." Defendant then said to her, "You're just a bitch." Somerset told Defendant not to disrespect Ingram, and Defendant replied, "She's a f[**]king bitch." At that point, Somerset exited the car, took his shirt off, yelled, "Let's end this[,]" and rushed towards Defendant. When Somerset was approximately five feet away, Defendant shot him in the chest with the shotgun. Somerset died of a shotgun wound to the chest.

In light of this evidence, there is a reasonable possibility that, had the trial court instructed the jury on the stand-your-ground provision and causal nexus requirement, the jury would have determined that Defendant's use of deadly force was justified because he reasonably believed that such force was necessary to prevent imminent death to himself and that there was no causal nexus between Defendant's felonious possession of a weapon of mass death and destruction and his use of force.

Accordingly, the trial court prejudicially erred by failing to instruct the jury on the stand-your-ground provision and the causal nexus requirement. Defendant is thus entitled to a new trial for the first-degree murder charge.

### 2. *Defense of Habitation*

As with the stand-your-ground provision, in light of the Supreme Court's decision in *McLymore*, the trial court erred by concluding that Defendant's possession of a weapon of mass death and destruction categorically disqualified him under N.C. Gen. Stat. § 14-51.4(1) from a jury instruction on the defense of habitation. Nonetheless, the trial court did not err by failing to give the requested defense of habitation instruction because the evidence did not support the instruction. *See State v. Hancock*, 248 N.C. App. 744, 748, 789 S.E.2d 522, 525 (2016) ("[A] trial court's ruling must be upheld if it is correct upon any theory of law, and thus it should not be set aside merely because the court gives a wrong or insufficient reason for it." (quotation marks, brackets, and citation omitted)).

N.C. Gen. Stat. § 14-51.2 codifies the defense of habitation and provides, in pertinent part, that "the lawful occupant of a home . . . is presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or another when using defensive force that is intended or likely to cause death or serious bodily harm to another if" (1) "[t]he person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered . . . [the] home[,]" and (2) "[t]he person who uses defensive force knew or had

reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred." N.C. Gen. Stat. § 14-51.2(b). "Home" is defined "to include its curtilage," N.C. Gen. Stat. § 14-51.2(a)(1) (2023), which includes the porch. *State v. Blue*, 356 N.C. 79, 89, 565 S.E.2d 133, 139 (2002).

Under the statute's plain language, the lawful occupant of a home is presumed to have held a reasonable fear of imminent death or serious bodily injury when using deadly force only if the person against whom the deadly force was used was *in the process of unlawfully and forcefully entering* or *had unlawfully and forcibly entered* the occupant's home, including the curtilage of the home, and the occupant of the home knew or had reason to believe that the unlawful and forceful entry was occurring or had occurred. *See State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) ("If the statutory language is clear and unambiguous, the court eschews statutory construction in favor of giving the words their plain and definite meaning." (citation omitted)). Accordingly, if the person against whom the deadly force was used was entering or had entered the occupant's home lawfully and without force, the presumption afforded by the defense of habitation does not apply.

The statute's plain language comports with the historic understanding and justification for the defense. In *State v. Miller*, our Supreme Court explained:

> When a trespasser enters upon a man's premises, makes an assault upon his dwelling, and attempts to force an entrance into his house in a manner such as would lead a reasonably prudent man to believe that the intruder intends to commit a felony or to inflict some serious

personal injury upon the inmates, a lawful occupant of the dwelling may legally prevent the entry, even by the taking of the life of the intruder. Under those circumstances, the law does not require such householder to flee or to remain in his house until his assailant is upon him, but he may open his door and shoot his assailant, if such course is apparently necessary for the protection of himself or family. . . . But the jury must be the judge of the reasonableness of defendant's apprehension.

267 N.C. 409, 411, 148 S.E.2d 279, 281 (1966) (quotation marks and citations omitted). Ten years later, our Supreme Court further explained that

one of the most compelling justifications for the rules governing defense of habitation is the desire to afford protection to the occupants of a home under circumstances which might not allow them an opportunity to see their assailant or ascertain his purpose, other than to speculate from his attempt to gain entry by force that he poses a grave danger to them.

*State v. McCombs*, 297 N.C. 151, 157, 253 S.E.2d 906, 910 (1979) (citation omitted). Although N.C. Gen. Stat. § 14-51.2 expanded the defense of habitation to allow deadly force not only to prevent an unlawful entry but also to terminate an unlawful entry, the justification for protecting the occupants from an intruder's unlawful entry has remained.

Here, the evidence at trial showed that Defendant, Somerset, and Ingram were sitting in the living room when "[t]hings just started escalating[.]" Defendant, Somerset, and Ingram then left the trailer for approximately twenty minutes to "calm down in a car ride[.]" During the car ride, the parties continued arguing. Ingram then stated, "You know what? I think it's best if you guys move because I'm going to

have to have my house back because I can't live with you all like this." They then pulled back into the driveway. Ingram wrote Defendant a notice to vacate the trailer and handed it to him as he exited the car. At that point, Somerset had lawfully entered Defendant's home and thus the justification for the presumption afforded by the defense of habitation did not apply.

Accordingly, the trial court did not err by denying Defendant's requested jury instruction on the defense of habitation.

## B. Defense of Justification

Defendant also argues that the trial court erred by denying his requested jury instruction on the defense of justification as to the possession of a weapon of mass death and destruction charge.

Our Supreme Court held in *State v. Mercer* that "in narrow and extraordinary circumstances," justification may be available as a defense to a charge of possession of a firearm by a felon under N.C. Gen. Stat. § 14-415.1. 373 N.C. 459, 463, 838 S.E.2d 359, 362 (2020). Under *Mercer*, a defendant is entitled to a jury instruction on the defense of justification to the charge of possession of a firearm by a felon only where each of the following four factors is supported by evidence taken in the light most favorable to the defendant: (1) "the defendant was under unlawful and present, imminent, and impending threat of death or serious bodily injury"; (2) "the defendant did not negligently or recklessly place himself in a situation where he would be forced to engage in criminal conduct"; (3) "the defendant had no reasonable legal alternative

to violating the law"; and (4) "there was a direct causal relationship between the criminal action and the avoidance of the threatened harm." *Id.* at 464, 838 S.E.2d at 363.

Here, Defendant was charged with possessing a weapon of mass death and destruction under N.C. Gen. Stat. § 14-288.8, not with possession of a firearm by a felon under N.C. Gen. Stat. § 14-415.1. Thus, under *Mercer*, Defendant was not entitled to a jury instruction on the defense of justification. We need not decide whether to extend *Mercer*'s holding to a charge of possession of a weapon of mass death and destruction because here, even if the defense were available, there is no record evidence, when taken in the light most favorable to Defendant, to support all of the four factors set forth in *Mercer*.

Accordingly, the trial court did not err by denying Defendant's requested jury instruction on the defense of justification as to the possession of a weapon of mass death and destruction charge.

### III.  Conclusion

The trial court prejudicially erred by failing to instruct the jury on the stand-your-ground provision and causal nexus requirement as to the first-degree murder charge. However, the trial court did not err by denying Defendant's requested jury instruction on the defense of habitation. Defendant is entitled to a new trial for the first-degree murder charge.

Furthermore, the trial court did not err by denying Defendant's requested jury

instruction on the defense of justification as to the possession of a weapon of mass death and destruction charge, and we find no error in Defendant's conviction for that charge. Nonetheless, because Defendant's pre-trial confinement credit was assigned to the vacated first-degree murder judgment, we remand the possession of a weapon of mass death and destruction judgment for resentencing after his new trial so that his credits may be properly applied.

NEW TRIAL IN PART; NO ERROR IN PART; REMANDED FOR RESENTENCING IN PART.

Judge MURPHY concurs.

Judge ZACHARY concurs by separate opinion.

No. COA23-337 – *State v. Vaughn*

ZACHARY, Judge, concurring.

I concur in the majority opinion. The defense of habitation, as set forth in N.C. Gen. Stat. § 14-51.2, is limited except as provided in that statute. Defendant is not entitled pursuant to the plain language of the statute to the requested jury instruction on the defense of habitation.

I write separately to emphasize that this Court "is an error-correcting body, not a policy-making or law-making one." *Fagundes v. Ammons Dev. Grp., Inc.*, 251 N.C. App. 735, 739, 796 S.E.2d 529, 533 (2017) (cleaned up). Whether it was the intent of the General Assembly to foreclose the defense of habitation from cases such as that before us—in which the curtilage was lawfully entered—is beyond judicial inquiry. "It is the province of the lawmaking power to change or modify the statute, not ours. What the General Assembly has written it has written, and if it be not satisfied with its present writing it can write again." *State v. Whitehurst*, 212 N.C. 300, 305, 193 S.E. 657, 661 (1937) (cleaned up).